**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 27, 2014**

# In the Court of Appeals of Georgia

A13A2002. IN THE INTEREST OF A. J. H., a child.

McMILLIAN, Judge.

The mother of A. J. H. appeals the juvenile court's order finding the child to be deprived. As her sole enumeration of error, the mother asserts that the juvenile court lacked clear and convincing evidence of deprivation. We reverse for the reasons set forth below.

On February 22, 2013, the paternal aunt and uncle of A. J. H. (collectively hereinafter, the "Petitioners") filed a private deprivation petition asserting that the child, then seven years old, was currently deprived. The petition sought custody of A. J. H. for a period of up to two years, the appointment of a guardian ad litem to represent the child's interests, and child support from A. J. H.'s parents.

Following a hearing, the juvenile court entered an order on March 19, 2013, finding, inter alia, that the mother had medically neglected the child by failing to administer his prescribed medications properly; the child appeared to have some emotional problems, but the mother failed to seek treatment for the child before the deprivation petition was filed; and the mother's home, porch and yard were often unclean and/or cluttered to the point of being unsafe for the child, despite the fact that the Department of Family and Children Services had worked with the mother in the past about these issues. Of these factors, the juvenile court "[was] most concerned with the medical neglect of the child's physical needs, and the neglect of his apparent emotional problems." Based upon these findings, the juvenile court determined that A. J. H. was deprived, that he was in need of protection, and that remaining in his mother's home would be contrary to his welfare. The court placed custody of the child with Petitioners for a period of up to two years.

"On appeal from a deprivation order, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation." (Citation omitted.) *In the Interest of S. D. H.*, 287 Ga. App. 684, 684 (652 SE2d 570) (2007). We do not weigh the evidence or determine the credibility of witnesses; instead we

defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met. *In the Interest of B. M. B.*, 241 Ga. App. 609 (527 SE2d 250) (1999).

So viewed, the evidence at the deprivation hearing indicated that the mother has two sons, with two different fathers. DFACS began working with the family in January 2012 based on a report that A. J. H. was not taking his prescribed medications and that the mother had thrown a television remote at him. DFACS initiated a safety plan for the children in March 2012, because A. J. H.'s father, who lived with the mother at the time, was reported to be drinking more, and there had been incidents of domestic violence in the past.[1] A. J. H. went to live with the Petitioners because the paternal aunt, a school teacher, was serving as his safety resource at the time. A. J. H. was returned home to his parents a month later with the aunt's recommendation. The other son went to live with his father as part of the safety plan, and he has not been back to his mother's home since.

---

[1] The last confirmed incident of domestic violence occurred in 2001, and although the mother later obtained at least three protective orders against the father, they were later dismissed.

A. J. H. had been prescribed at least four different medications, including sleeping pills and prescriptions for ADHD and asthma.[2] The aunt testified that when the child stayed with her, the mother often failed to give her any, or enough of, his afternoon and nighttime prescriptions. At the hearing, the mother produced a number of bottles containing A. J. H.'s prescriptions, some of which required daily doses and which, although filled a month or more prior to the hearing, appeared to be almost full. The mother stated, however, that some of the medications were optional and/or the dosages had been reduced.

Approximately, one month prior to the hearing, A. J. H. also had been prescribed antibiotic eardrops for what the aunt described as a "severe ear infection." The problems with A. J. H.'s ears occurred while he visiting his aunt and uncle, and they took him to the doctor after they were unable to reach the mother. The mother met them at the doctor's office, and the boy went home with her. At the time of the hearing, however, the bottle of eardrops was still sealed, and the mother said she

---

[2] The mother herself took a number of different medications for diabetes, blood pressure, cholesterol, and "nerves."

could not remember whether she gave A. J. H. the eardrops as prescribed because he said that his ears had stopped hurting.[3]

The mother lived in a single-wide mobile home, on which the father paid the mortgage and the insurance, while the mother was responsible for paying the electricity. She admitted that she got behind on her electric bill, and her power had been turned off. The mother's friend, Sammy,[4] helped her get the power turned back on, and she was attempting to pay off her past due balance at the rate of $300 per month, in addition to her regular $300-$400 monthly power bill.[5]

At the time of the hearing, the mother said that she had four dogs, only one of which, the Chihuahua, lived in the house. She testified that she previously had a

---

[3] The mother originally stated that she had more eardrops at home, but later testified that she could only get one bottle of eardrops with no refills.

[4] The juvenile court found that the mother's friend Sammy was often around the child, even though the mother admitted that she did not know if he had a criminal record. The mother testified that she did not care about this because Sammy was just a friend. Although the mother denied that Sammy lived with her, the aunt testified that he was the mother's boyfriend and that he lived with the mother. The record contains no evidence, however, that Sammy had a criminal record.

[5] The mother, who was on disability, stated that she received about $710 per month and received about $200 in food stamps. On the day of the hearing, on March 5, 2013, the mother had only $20 to last her until she received food stamps on March 16, and she would not receive another disability check until April. The mother said, however, that she had plenty of food and gas to provide for A. J. H.'s needs.

Boston Terrier that lived in the house, but he had recently been poisoned. And a Doberman Pinscher had recently been hit on the head and killed. The mother denied that she had dog feces in her house, but admitted that she had chicken droppings on her porch. She acknowledged that the dogs always slept with A. J. H. in the past. Additionally, the Petitioners' attorney introduced copies of photographs the mother posted on Facebook that the mother admitted showed dogs sleeping with A. J. H. and also showed chickens inside her house.

The mother also posted pictures of A. J. H. in his underwear on Facebook, which she admitted was not "a good thing." She further acknowledged that she took a picture with her phone of the child posing without his clothes on and showed it to relatives. The mother also took another photograph of her child's anus and showed it to a DFACS investigator because she was concerned that something might be wrong with him.

The mother said that A. J. H. often would elect not to wear clothes while at her home, and she acknowledged that, approximately six months earlier, he climbed a tree without his clothes and defecated. On another occasion, he stripped down to his

underwear and painted himself blue.[6] She also reported to DFACS that A. J. H. had touched an adult woman in an inappropriately sexual manner and introduced into evidence a sexually explicit picture that she said the child had drawn. A. J. H., however, denied that he drew the picture. The mother also acknowledged that the boy wrote obscenities on his car seat. The mother further said that A. J. H. did not want to do his homework. She had tried to work with him herself, and the day before the hearing she had taken him for help with his ADHD and his "attitude and stuff."

The aunt testified that when she picked up A. J. H. for court-ordered visitation, she often noticed that the mother's speech was slurred, her eyes were bloodshot and her emotions were "like a roller coaster." During a recent visit to the mother's home, the aunt observed that there was trash "everywhere" and feces all over the porch, requiring that she be careful where she stepped. The mother acknowledged that during that visit, approximately two weeks before the hearing, her front porch was covered with animal feces and trash bags, but she said the mess had all been cleaned up. The day before the hearing, the DFACS investigator went to the mother's home on a scheduled visit, and she testified that it was clean. The chickens had been moved

_____

[6] The aunt testified that the boy appeared to have become upset, and these behaviors began, after the father moved out of the house and the mother obtained a TPO against him.

to a pen on the side of the yard, and the porch no longer had chicken droppings, but she acknowledged that the porch had chicken droppings when she made an unannounced visit a few weeks earlier.

The investigator testified that DFACS had referred the mother to an agency for assistance with money management and with the child in March 2012 when it instituted the safety plan, and the mother had been working with the agency for approximately one year. The investigator had no major concerns about the mother's home or about the child's well-being in the mother's home, with the caveat that she would be concerned if the child was not taking his medications. If that were the case, DFACS would open a case to monitor the situation. Before the deprivation hearing, the DFACS case worker was unaware of the unopened eardrops, the nude photograph of the child the mother showed to relatives, and the incident of the child climbing the tree naked. She said that those instances would give her "definite concerns."

At the close of the evidence at the hearing, the guardian ad litem stated that she was concerned about the situation, particularly, A. J. H.'s inappropriate sexual behavior and refusal to wear clothes. She recommended that the court find the child to be deprived and that the court transfer him to DFACS's care, and with their approval, to place him with the paternal aunt.

8

Under Georgia law, a "deprived child" is a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). "That definition focuses upon the needs of the child regardless of parental fault. The deprivation petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Citation and punctuation omitted.) *In the Interest of D. Q.*, 307 Ga. App. 121, 124 (704 SE2d 444) (2010). See also *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997). Additionally, the record must contain evidence of "present deprivation, not past or potential future deprivation." (Citation and punctuation omitted.) *In the Interest of R. S. T.*, 323 Ga. App. 860 (748 SE2d 498) (2013).

After making a finding of deprivation, "[a] juvenile court is authorized under OCGA § 15-11-34 (a) to impose alternative orders of disposition 'best suited to the protection and physical, mental and moral welfare of the child." *In the Interest of J. P.*, 267 Ga. at 492. But even a temporary loss of custody is not authorized unless clear and convincing evidence exists that "the deprivation resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in

9

the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citation and punctuation omitted.) *In the Interest of C.R.*, 292 Ga. App. 346, 351 (2) (665 SE2d 39) (2008). It follows that "only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship." (Citation and punctuation omitted.) *In the Interest of H. S.*, 285 Ga. App. 839, 841 (648 SE2d 143) (2007).

Here, even construing the evidence in favor of the juvenile court's factual findings, we conclude that the record lacks clear and convincing evidence to support the court's conclusion that A. J. H. was deprived within the meaning of OCGA § 15-11-2 (8) (A). Although the evidence showed that the mother may not have given A. J. H. all of his prescribed medication, she testified that the doctor had told her that some of the medicines were to be taken as needed or the dosages had been reduced. The Petitioners presented no evidence to counter this explanation; nor did they present any evidence that A. J. H. had suffered any ill effects from an inconsistent use of medication. No medical testimony was presented regarding the child's diagnoses, the purpose of the prescriptions, or the potentially negative impact of failing to administer the medications as prescribed. Further, the record contains no evidence that the child's behavior was negatively affected by any failure to administer the

10

medication for ADHD or that his asthma had been adversely affected by a failure to properly administer his prescribed medication. Although the evidence showed that the bottle of eardrops was still sealed, the mother testified that the boy's ears had stopped hurting, and the Petitioners produced no evidence that A. J. H.'s ear problems persisted or worsened without the medication.

Moreover, although evidence was presented showing that the child did not like to wear clothes and that he exhibited unusual behaviors, no one other than the mother testified to witnessing any of these incidents. In fact, the aunt testified that she never had to discipline A. J. H. and that he behaved very well while at her home. And the record contains no evidence that these behaviors were, or even could have been, the result of any mental or emotional problems requiring treatment. Additionally, although the evidence showed that the mother often kept a dirty home, no evidence was presented that A. J. H. ever suffered from the conditions at the mother's home or from his contact with the dogs and other animals.

"While we cannot say that [the facts in this case] would never merit a finding of deprivation, under these circumstances, where [the Petitioners have] failed to demonstrate harm to [the child], clear and convincing evidence of deprivation has not been established." (Citation omitted.) *In the Interest of C. L. Z.,* 283 Ga. App. 247,

11

249 (641 SE2d 243) (2007) (reversing finding of deprivation where no evidence of harm to child from grandmother's behavior). See also, e.g., *In the Interest of S. M.*, 321 Ga. App. 827, 831-32 (743 SE2d 497) (2013) (reversing finding of deprivation where no evidence of harm shown to children after mother's boyfriend drew gun and children believed he had shot her); *In the Interest of J. H.*, 310 Ga. App. 401, 403-404 (713 SE2d 472) (2011) (reversing finding of deprivation where no evidence presented that mother's dirty home, lack of a great variety of food, and failure to insist toddler wear anything but a diaper in the summer caused the child harm); *In the Interest of T. L.*, 269 Ga. App. 842, 843-846 (2) (605 SE2d 432) (2004) (reversing finding of deprivation because there was no evidence showing how child was negatively affected by "filthy" conditions in home).

Even granting that the evidence was sufficient to raise concerns with regard to the mother and child, the DFACS worker testified that she had no problem with the mother's home and that DFACS was prepared to continue its work with the family. Although the evidence showed that the mother's conduct in keeping her home and caring for the child may not have been exemplary, it failed to show by clear and convincing evidence that her conduct has been below the requisite standard such that the courts should intervene and remove the child from her custody. Accordingly, we

12

conclude that the Petitioners failed to establish sufficient evidence of parental unfitness to justify removing A. J. H. from his mother's home.

*Judgment reversed. Andrews, P. J., and Dillard, J., concur.*