**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 12, 2015**

# In the Court of Appeals of Georgia

A14A2032. IN THE INTEREST OF G. R. B., a child.

DILLARD, Judge.

Jesse Bowen, the father of G. R. B., appeals the Juvenile Court of Whitfield County's order finding his son to be deprived and granting permanent legal custody to the child's maternal grandparents. Because we agree with Bowen that the juvenile court lacked clear and convincing evidence upon which to base a finding of deprivation, we reverse.[1]

---

[1] In 2013, the General Assembly amended Title 15 of the Georgia Code "so as to substantially revise, supersede, and modernize provisions relating to juvenile proceedings and enact comprehensive juvenile justice reforms recommended by the Governor's Special Council on Justice Reform in Georgia . . . ." Ga. Laws 2013, Act 127. And as part of that statutory overhaul, the General Assembly amended the definitions applicable to juvenile proceedings. *See* Ga. Laws 2013, Act 127, § 1-1; *see also* OCGA § 15-11-2 (codification of new definitions for juvenile proceedings). Effective January 1, 2014, the new definitions contained in OCGA § 15-11-2 became

The record reflects that G. R. B. was born on December 8, 2012, to Bowen and the child's mother, who are not and never have been married to each other.[2] On June 27, 2013, Bowen filed a petition for legitimation and custody in the Superior Court of Murray County. And on July 31, 2013, G. R. B.'s maternal grandparents, Greg and Ashley Welch ("the Welches"), filed a motion to intervene and a complaint for grandparent custody and visitation in that same court. Simultaneously, the Welches also filed an emergency private petition for deprivation in the Juvenile Court of Whitfield County, which resulted in an immediate grant of temporary custody to them

---

applicable to juvenile proceedings commenced on and after that date. Ga. Laws 2013, Act 127, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date."). The former definitions used the term "deprived" to mean a child who was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." *See* Former OCGA § 15-11-2 (8) (A). But the new definitions refer to a child as "dependent," rather than "deprived," which is a child who, *inter alia*, "[h]as been abused or neglected and is in need of the protection of the court . . . ." OCGA § 15-11-2 (22) (A). "Neglect" is then defined to mean, *inter alia*, "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals . . . ." OCGA § 15-11-2 (48) (A). Although Bowen contends that the juvenile court erred in finding G. R. B. "dependent," this opinion uses "deprived" because the proceedings in this case were commenced by petitions filed in 2013, although the juvenile court's final order was not entered until 2014.

[2] The mother is not a party to this appeal.

by the juvenile court. Then, on August 8, 2013, the Welches filed a subsequent verified private petition to determine deprivation and an award of custody in the Juvenile Court of Whitfield County, and a guardian ad litem was appointed for the child.

On August 19, 2013, the Superior Court of Murray County issued an order consolidating all pending actions and transferring the matters to the Juvenile Court of Whitfield County. Thereafter, on August 29, 2013, the juvenile court declared Bowen to be G. R. B.'s legitimate father. In this same order, as to the Welches' petition for deprivation, custody, and visitation, the court found that (1) there was "a significant history of mental health problems" on the part of the mother; (2) the mother and father had separated and reconciled many times; (3) the mother and father had engaged in acts of domestic violence in G. R. B.'s presence with the mother pushing the child into his crib during a June 2013 incident; (4) the Welches and maternal great-grandparents had both provided day-to-day care for G. R. B. for "a significant amount of the time" and had formed a "significant bond and relationship" with G. R. B.; and (5) both parents were gainfully employed and could provide

3

"adequate housing and income for the child."[3] Nevertheless, the juvenile court was concerned with "the domestic violence, and the mother's maintaining her medication regime." As such, the court continued the case for a three-month period, returned G. R. B. to the parents' custody, and directed that DFCS should open a family preservation case to ensure that the parents complied with orders to complete a parenting class, enroll in a marriage/relationship class, and complete anger-management courses.

On January 2, 2014, following a December 9, 2013 hearing,[4] the juvenile court issued an order *nunc pro tunc*, making the following findings of fact: (1) that an additional act of domestic violence had occurred on October 26, 2013, resulting in the mother's arrest; (2) the mother's initial bond conditions required that she have no contact with Bowen; and (3) the mother's bond conditions were modified in December 2013 with Bowen's consent to allow contact so long as the mother complied with certain requirements. Accordingly, the juvenile court again continued

---

[3] Although the order indicates that a two-day hearing was held on these matters, no transcript from the August 28-29, 2013 hearing was included in the appellate record.

[4] The appellate record does not contain a transcript from the December 9, 2013 hearing.

the matter for another three-month period, ordered DFCS to maintain the family preservation case to ensure the parents' compliance with the requirements of the August 29, 2013 order, and ordered the mother to immediately enroll in and complete anger-management courses. Nevertheless, the court allowed G. R. B. to remain in the parents' custody.

Then, on March 6, 2014, *nunc pro tunc* to February 24, 2014, the juvenile court entered an emergency order following an emergency hearing conducted on February 24, 2014. The order transferred temporary custody of G. R. B. to the Welches, granted visitation to the mother, and ordered Bowen to immediately submit to urine and hair-follicle drug tests, with visitation dependent upon negative results. The order also directed that a DFCS safety plan issued on February 18, 2014, remain in effect.[5]

The transcript from the February 24, 2014 hearing shows that, according to the Welches' counsel, it was held in response to both a recent physical altercation between Bowen and the mother's then-boyfriend in the mother's presence, and to a request by DFCS that Bowen submit to drug testing. A representative for DFCS volunteered that Bowen had "shown a little bit more stability than the mother" but that Bowen had apparently failed to submit to a requested drug test. Counsel for the

---

[5] No written safety plan appears in the appellate record.

mother then interjected his belief that the parties were all appearing "on kind of an emergency scenario kind . . . of situation rather than a full-blown hearing" based upon allegations that Bowen had recently engaged in the physical altercation and had indicated to the mother that he was "back on meth," which led to DFCS requesting that Bowen submit to a drug test. And according to the mother's counsel, DFCS instructed the Welches to not return G. R. B. to Bowen's custody until he submitted to a test, which the DFCS representative confirmed. Bowen's counsel then indicated his belief that his client was entitled to a 72-hour hearing as to whether there existed probable cause to deprive Bowen of custody.

Following an additional explanation that the allegations of drug use were made in the wake of an alleged physical altercation between Bowen and the mother's new boyfriend after the mother moved out of the couple's residence (that incident having apparently been the *initial* reason for seeking an emergency hearing),[6] the juvenile

---

[6] There is no written petition in the record seeking an emergency hearing and, as such, this Court's knowledge of what led to same is based entirely upon the transcript. And given the other items absent from the appellate record (noted *infra* and *supra*), as well as the seriousness of the removal of a child from his or her parent, we remind parties in these types of proceedings that "although the chronology and the nature of events may be clear to the witnesses, and others involved in the lower court proceedings, including the presiding judge, without the development of a full and complete record, this Court is greatly hampered in its consideration of the issues presented." *In the Interest of A. J. I.*, 277 Ga. App. 226, 228 n.2 (626 SE2d 195)

court asked why Bowen went to see the mother. When Bowen's counsel responded that "the two of them have an attraction to each other that is not healthy for either one of them," the court expressed frustration with the situation as follows:

> I'm done with this crap. After all this time, if you can't understand stay away. I don't know how much more basic it can get. We're going to set this down for a final hearing and this is going to be done one way or the other.

> *If you cannot understand the basic idea of staying away, you're not only going to lose custody, you're going to lose visitation. And if you all continue this, I'm going to put this child beyond your reach for good and you can appeal it if you don't like it.*

> What idiocy. How long has this been going on? My lord, since July. Don't say a word. This is ridiculous; ridiculous; asinine.[7]

Ultimately, as reflected in the *nunc pro tunc* order, the juvenile court ordered Bowen to undergo drug testing and for G. R. B. to remain in the Welches' custody.[8]

---

(2006).

[7] Emphasis supplied.

[8] Although there is no written documentation of same, testimony at the final hearing in April 2014, discussed *supra*, established without question that when Bowen submitted to this ordered test, the results were positive for the use of illegal drugs.

Following the February 24, 2014 hearing, on February 26, 2014, Bowen's parents—G. R. B.'s paternal grandparents—filed their own motion to intervene in the proceedings in the juvenile court, alleging that the child was deprived and seeking custody or, in the alternative, grandparent-visitation rights.

The juvenile court conducted its promised final hearing on April 9, 2014. And on April 14, 2014, the juvenile court issued a "final order on all pending matters." In that order, the court noted that G. R. B.'s mother had consented to placing the child in the Welches' custody, and found, as to Bowen specifically, that he had completed the required parenting class, relationship class, and anger-management program, but that he had engaged in a physical altercation with another man in the mother's presence "while under the influence of alcohol and methamphetamine" and brandished a gun during the incident. The court also found that "[t]he father now admits he uses methamphetamine every day and has for the past five years," though the court also acknowledged that Bowen had started treatment within the last month. The court further found that the parents "have a relationship that has been fraught with domestic violence and instability" and that both were "unsure whether they intend to remain in their current state of separation."

Having made the foregoing findings, and after noting that the guardian ad litem had recommended that custody of the child be placed with the Welches, the juvenile court determined that, no matter whether an order was entered as to the deprivation petition or the "matter transferred from the Superior Court," the custody determination would "be considered permanent until modified by subsequent order of the court." The court further found that G. R. B. "would be in danger of harm if placed with the father" because, notwithstanding his completion of the required classes, he had recently engaged in the "potentially deadly, violent incident fueled by alcohol and methamphetamine" and had "only recently begun treatment for his admitted five year addiction of daily methamphetamine use." Additionally, the court was troubled by the parents' perceived inability "to recognize the problematic nature of their continuing to have a relationship." The court also noted testimony from a DFCS case manager that the Department would have "major concerns" if G. R. B. were placed with Bowen prior to the completion of substance-abuse treatment and without addressing the "pattern of domestic violence" between the parents.

Thus, the juvenile court ordered that permanent legal custody of G. R. B. be placed with the Welches, that the parents pay child support, and that the parents be granted visitation. Finally, the court indicated that for the parents to "be considered

9

for a return of custody," they would need to complete certain requirements. Bowen now appeals from the juvenile court's determination that G. R. B. was deprived and its grant of permanent legal custody to the Welches, contending that the court lacked clear and convincing evidence to support a finding of deprivation. We agree.

At the outset, we note that on appeal from a deprivation order, we view the evidence "in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation."[9] In this review, we do not weigh the evidence or determine the credibility of witnesses; "instead we defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met."[10] And here, even viewing the evidence in the light most favorable to the lower court's judgment, the evidence does not support the court's finding of deprivation.

Although the evidence reflected that Bowen engaged in a physical altercation with the mother's then-boyfriend in February 2014, and that he brandished a firearm

---

[9] *In the Interest of A. J. H.*, 325 Ga. App. 848, 848 (755 SE2d 241) (2014) (punctuation omitted); *accord In the Interest of S. D. H.*, 287 Ga. App. 684, 684 (652 SE2d 570) (2007).

[10] *In the Interest of A. J. H.*, 325 Ga. App. at 848; *see also In the Interest of B. M. B.*, 241 Ga. App. 609, 609 (527 SE2d 250) (1999).

during the incident and was seen in possession of an alcoholic beverage, there was no evidence that he was under the influence of methamphetamine during the incident. Indeed, G. R. B.'s mother testified that Bowen did not appear to be under the influence of drugs or alcohol during the incident, although he was in possession of a beer. Additionally, it was undisputed that G. R. B. was not present during the incident and, as such, there was no showing that G. R. B. was in any way harmed by the altercation.

As to the juvenile court's finding that "[t]he father now admits he *uses* methamphetamine every day and has for the past five years,"[11] this determination must be considered in its proper evidentiary context. Indeed, while it is certainly true that Bowen admitted to *previously* using methamphetamine daily for five years, the father testified that he never did so in G. R. B.'s presence[12] and that at the time of the hearing, he had been in treatment for approximately one-and-a-half months, was attending weekly substance-abuse classes and meetings, and had passed recent drug tests. He also testified that substance-abuse rehabilitation had changed his outlook on

---

[11] Emphasis supplied.

[12] Bowen did, however, acknowledge that he had previously been under the influence of the drug in G. R. B.'s presence.

11

life since the February 2014 altercation, that he was willing to submit to random drug tests, and that he could not "fall off the wagon" and use drugs again for G. R. B.'s sake.

Regarding his relationship with G. R. B.'s mother, Bowen admitted that previous physical altercations between the two had occurred in G. R. B.'s presence (and that those incidents were probably emotionally upsetting even for an infant), but that he had no plans to reunite with the mother. The mother, too, testified that she had no plans to get back together with Bowen, although she could not swear that it would *never* happen.

Finally, Bowen testified that he lived alone in a two-bedroom mobile home that was equipped to care for G. R. B., that he was gainfully employed, and that he provided G. R. B. with life necessities when the child was in his care.

A representative for DFCS declined to make a placement recommendation on the record at the conclusion of the hearing but, upon request for clarification from the juvenile court, testified that the Department wanted all of Bowen's substance-abuse and anger-management issues "appropriately addressed" before considering him for placement. Nevertheless, this testimony from the DFCS representative came after the representative testified that the Department (1) had "no concerns" about G. R. B.'s

well being while in Bowen's care, (2) had no concern that Bowen was incapable of providing G. R. B. with a safe and healthy living environment, (3) found no evidence that Bowen had ever exposed G. R. B. to physical or emotional threats, (4) found no indication that placement with Bowen would result in an abusive situation or that he would be neglectful of or incapable of providing for G. R. B.'s daily needs, (5) deemed all homes at issue to be "acceptable" for placement, (6) found no indication that previous incidents of domestic violence between the parents had a negative impact upon G. R. B., (7) was unaware of any issue DFCS had with Bowen's efforts or progress since the February 2014 hearing, and (8) was unaware of anything that Bowen had not made "significant progress on" or "completed."

Additionally, the actual DFCS caseworker assigned to the case testified separately that Bowen had completed the marriage/relationship class, an anger-management class, and a parenting class; and that both parents were compliant and easy to work with. She further represented that DFCS would like for Bowen to complete his substance-abuse treatment prior to any return of custody, that DFCS would like to see multiple clean drug screens, and that DFCS was concerned about the parents having any ongoing relationship. However, she also testified that since Bowen's positive drug-test result after the February 24, 2014 hearing, he had "hit the

ground running" by enrolling in treatment, had tested negative on all subsequent drug tests, and had started a new job.

Considering the foregoing, the juvenile court lacked clear and convincing evidence by which to make a determination that G. R. B. was *presently* deprived as to Bowen. As we have previously explained, when a juvenile court is faced with a petition to find a child deprived, such a petition "is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[13] Indeed, the definition of "deprived" focuses "upon the needs of the child regardless of parental fault."[14] And the record must contain evidence of *present* deprivation, *not* merely past or potential future deprivation.[15]

---

[13] *In the Interest of A. J. H.*, 325 Ga. App. at 851 (punctuation omitted); *accord In the Interest of D. Q.*, 307 Ga. App. 121, 124 (704 SE2d 444) (2010).

[14] *In the Interest of A. J. H.*, 325 Ga. App. at 851 (punctuation omitted); *see also* Former OCGA § 15-11-2 (8) (A) (defining a "deprived" child as one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals").

[15] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *In the Interest of R. S. T.*, 323 Ga. App. 860, 863 (748 SE2d 498) (2013).

Finally, the party who brings the petition alleging deprivation, *not* the parent from whose custody the child is being removed, carries the burden of proof.[16]

Once a juvenile court finds that a child is deprived, the court is authorized "under former OCGA § 15-11-34 (a) to impose alternative orders of disposition best suited to the protection and physical, mental and moral welfare of the child."[17] Nevertheless, even a *temporary* loss of custody is not authorized unless there is clear and convincing evidence that "the deprivation resulted from the unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[18] Thus, only under *compelling* circumstances that

---

[16] *In the Interest of T. P.*, 291 Ga. App. 83, 86 (3) (661 SE2d 211) (2008); *In the Interest of G. S.*, 279 Ga. App. 89, 92 (630 SE2d 607) (2006); *see also In the Interest of D. C.*, 259 Ga. App. 157, 159 (576 SE2d 77) (2003) (holding that "juvenile court was authorized to find that DFACS did not carry its burden of proving the allegations of deprivation by clear and convincing evidence, and that the natural mother's right to custody of her children has not been lost").

[17] *In the Interest of A. J. H.*, 325 Ga. App. at 852 (punctuation omitted); *accord In the Interest of J. P.*, 267 Ga. 492, 492 (480 SE2d 8) (1997).

[18] *In the Interest of A. J. H.*, 325 Ga. App. at 852 (punctuation omitted); *accord In the Interest of C. R.*, 292 Ga. App. 346, 351 (2) (665 SE2d 39) (2008).

are found to exist by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship.[19]

In the case *sub judice*, even construing the evidence in favor of the juvenile court's findings of fact, we conclude that the record lacks clear and convincing evidence to support the juvenile court's determination that G. R. B. was deprived within the meaning of former OCGA § 15-11-2 (8) (A). There was no evidence that the child was harmed by the February 2014 physical altercation between Bowen and the mother's boyfriend when, in fact, G. R. B. was not even present during the altercation. There was also no evidence that the child was harmed by the prior acts of domestic violence between the parents, except to the extent that the *mother*, not Bowen, had during one such incident pushed the child into his crib.[20] And while DFCS and the court were both troubled by the possibility that Bowen and the mother

---

[19] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *see also In the Interest of H. S.*, 285 Ga. App. 839, 841 (648 SE2d 143) (2007); *In the Interest of A. J. I.*, 277 Ga. App. 226, 227 (626 SE2d 195) (2006); *In the Interest of S. J.*, 270 Ga. App. 598, 599 (607 SE2d 225) (2004).

[20] *See In the Interest of M. L. C.*, 249 Ga. App. 435, 438-39 (2) (548 SE2d 137) (2001) (reversing finding of deprivation when there was no evidence that child was present during domestic-violence altercations between parents or otherwise harmed by them); *cf. In the Interest of C. L. Z.*, 283 Ga. App. 247, 249 (641 SE2d 243) (2007) (reversing finding of deprivation when there was no evidence of emotional or physical harm to child from isolated incident of physical and emotional abuse).

16

might someday reunite, the couple was separated at the time of the hearing, and both parties testified that they had no present intention to reunite.[21] Finally, although Bowen admitted to previously using methamphetamine daily for five years, and although a juvenile court may consider prior substance abuse to infer harm to a child even when there is no showing of actual harm,[22] the evidence established that Bowen had passed several drug screens since the February 2014 hearing, Bowen indicated a willingness to undergo random drug tests, Bowen testified to having a strong desire

---

[21] *See In the Interest of C. D. E.*, 248 Ga. App. 756, 761-62 (1) (546 SE2d 837) (2001) (reversing finding of deprivation when, despite juvenile court's concern over prior incidences of domestic violence between parents, parents were separated at the time of the hearing and had no intention of getting back together, and rejecting argument that finding should be upheld because there was no guarantee that parents would never get back together).

[22] *See* Former OCGA § 15-11-94 (b) (4) (B) (ii) (providing that, in determining whether a child is without proper parental care or control, the juvenile court may consider "[e]xcessive use of or history of chronic abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child") (recodified with minor changes at OCGA § 15-11-311 (a) (2)); *see also In the Interest of K. W.*, 279 Ga. App. 319, 321 (631 SE2d 110) (2006) ("[A] juvenile court is entitled to infer an adverse effect on the children when there is evidence of chronic alcohol or drug abuse by the parent."); *In the Interest of J. L.*, 269 Ga. App. 226, 229 (1) (603 SE2d 742) (2004) (holding that, although there was no evidence that parent's use of illegal drugs had adversely affected child, "it is a fair inference that use of cocaine by a parent has an adverse effect on a minor child").

to stay sober for the sake of his child, and Bowen was one-and-a-half months into completing a nine-month substance-abuse program.[23]

Accordingly, we conclude that the petitioners (the Welches) failed to establish sufficient evidence of parental unfitness, and we therefore reverse the juvenile court's finding of deprivation and its subsequent award of permanent legal custody to the Welches.[24]

*Judgment reversed. Doyle, P. J., and Miller, J., concur.*

---

[23] *See In the Interest of M. L. C.*, 249 Ga. App. at 438-39 (reversing finding of deprivation when, although father admitted to previous addiction to marijuana, he had used only once in the preceding ten months and had passed monthly drug tests); *cf. In the Interest of K. W.*, 279 Ga. App. at 322 (affirming finding of deprivation and holding that it was fair to infer harm to child from mother's chronic abuse of methamphetamine when, despite ongoing DFCS investigation into her addiction, mother did not cease using the drug); *In the Interest of J. L.*, 269 Ga. App. at 227-28, 229 (1) (affirming finding of deprivation and holding that it was fair to infer that parent's chronic abuse of illegal drugs would have an adverse effect on child, but parent had failed repeated drug tests despite enrollment in treatment, refused to complete treatment, was hostile toward DFCS workers, and admitted to continued use of illegal drugs).

[24] *See In the Interest of J. H.*, 310 Ga. App. 401, 403-04 (713 SE2d 472) (2011) (reversing determination that child was deprived when record lacked clear and convincing evidence of harm to child).