**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 18, 2019**

# In the Court of Appeals of Georgia

A19A0226. IN THE INTEREST OF T. Y. et al., children.

DILLARD, Chief Judge.

The mother of six children appeals from an order of the Juvenile Court of Emanuel County seemingly finding each of the children to be dependent and, thus, denying her motion for immediate reunification and return of the children from the custody of the Emanuel County Division of Family and Children Services ("DFCS"). She contends the juvenile court erred in finding that DFCS established by clear and convincing evidence that her children were dependent, that such dependency was likely to continue, and in modifying her supervised visitation without applying the appropriate legal standard. For the reasons set forth *infra*, we vacate the juvenile court's order and remand for additional proceedings consistent with this opinion.

Viewed in the light most favorable to the juvenile court's judgment,[1] the record shows that the mother is the biological parent of six children, including T. Y., a son born in 2006; K. T., a daughter born in 2010; L. T., a son born in 2011; H. T., a daughter born in 2013; J. T., a daughter born in 2014; and A. T., a son born in 2017. Joseph Yeater—whose whereabouts are unknown—is the biological father of T. Y., and Lawrence Turner is the biological father of the remaining children. Turner is currently incarcerated, having pleaded guilty to charges of vehicular homicide.

DFCS's first involvement with the mother and her children occurred in May 2010, when the mother's second oldest child drowned in the bathtub. At that time, DFCS imposed a safety plan, which was ultimately closed. DFCS became involved again in 2014, when the mother noticed bruising on T. Y. after Turner spanked the child and called the police. Turner was charged with cruelty to children, and DFCS implemented a safety plan requiring that he be separated from all the children.

On November 18, 2015, police officers found then eight-year-old T. Y., who has been diagnosed as autistic, wandering the streets alone after midnight. When

---

[1] *See In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016) (noting that this Court reviews "the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent").

2

questioned, he told authorities that he was going to Wal-Mart to buy a new mother, provided his mother's name, and claimed that he had run away from home before. The mother was located later that day, but when investigators went to the home, they found it to be unsafe. Consequently, on November 23, 2015, DFCS filed a petition alleging that T. Y., five-year-old K. T., three-year-old L. T., two-year-old H. T., and one-year-old J. T. were all dependent. That same day, the juvenile court entered a preliminary protective hearing order, *nunc pro tunc* to November 19, 2015, placing the children in the temporary custody of DFCS.

On December 16, 2015, the juvenile court—with the mother and Turner's consent—entered an order of adjudication and disposition finding the children to be dependent and, again, granting temporary custody of the children to DFCS. The juvenile court further noted the cruelty-to-children charge pending against Turner as a result of his unreasonable, excessive use of corporal punishment against T. Y. and that he had other pending criminal charges in Jeff Davis County, including homicide by vehicle in the first degree, driving under the influence of alcohol, and failure to maintain lane. Additionally, as part of this order, the juvenile court incorporated a reunification plan, which required Turner and the mother to establish and maintain an appropriate home and income for the children, undergo psychological evaluations

3

and any treatment recommended as a result of such evaluations, complete a certified parenting class, and fully cooperate with DFCS.

On May 31, 2016, the mother and Turner filed a motion seeking to regain custody of the children on the ground that they had completed most of their reunification plan goals. But in a "Judicial Review Order" dated June 23, 2016, the juvenile court noted that then five-year-old K. T. alleged to her foster parent that Turner sexually abused her. An investigation was conducted, and although the allegations could not be substantiated at that time, K. T.'s foster parent continued to express concerns. Additionally, the advocacy center that investigated K. T.'s allegation of abuse recommended the child have no contact with Turner and that a more thorough investigation be conducted. Nevertheless, on July 27, 2016, the mother and Turner filed another motion, this time requesting to reestablish visitation with K. T. and, alternatively, for a return of custody of all the children. On January 12, 2017, following a December 8, 2016 hearing, the juvenile court denied the mother and Turner's July 27, 2016 motion, finding that the mother had yet to seek counseling for her various mental-health issues and that Turner still had several criminal charges pending against him.

On April 13, 2017, the juvenile court entered a judicial review and permanency hearing order, finding that the mother had given birth to another child (A. T.) and had hidden her pregnancy from both DFCS and the court. In addition, the juvenile court's order found that the mother failed to comply with her reunification case plan and Turner had been sentenced to 15 years in prison with five years to serve after pleading guilty to the vehicular-homicide charges. On July 13, 2017, the juvenile court issued another order, finding that although the mother had made progress on her plan, she required further mental-health treatment.

On July 21, 2017, the mother filed a motion to return all the children to her custody, arguing that it was the children's best interest to be reunified with their mother and the DFCS case worker and children's pediatrician concurred.[2] The juvenile court held a multi-day hearing on the mother's motion on August 31, 2017; September 22, 2017; and September 28, 2017. And during that hearing, the DFCS case worker testified that the mother had positive interactions with the children during visitations and was complying with her case plan, including continuing to

[2] The impetus behind this filing appears to have been a July 13, 2017 hearing, during which the DFCS case worker and the children's pediatrician testified. With the consent of all parties, the juvenile court took judicial notice of the testimony submitted during the hearing for the purposes of its final order.

undergo counseling for her mental-health issues. She also testified that the mother's new home is clean and safe, but conceded that the home was in Turner's name, who was currently incarcerated. With regard to Turner, the case worker admitted that she had concerns about him being around the children upon his release, in light of the allegations that he physically abused T. Y. and sexually abused K. T., but she did not believe the mother would risk losing her children by allowing Turner back into her life. She also acknowledged that the mother claimed she was uncertain as to whether Turner caused T. Y.'s bruises and that she had no intention of seeking a divorce. Additionally, the case worker admitted that the mother lied to her about being pregnant with A. T. and, in fact, did not admit that A. T. was her child until nearly two months after his birth. Nevertheless, the case worker recommended that all six children be returned to the mother's custody.

The juvenile court also considered testimony from a child psychologist charged with treating K. T. for post-traumatic stress disorder, who opined that the child's evaluations were consistent with that of a child who had been sexually abused. The psychologist further testified that she did not think K. T. should be returned to the mother's custody until it could be determined whether she was complicit in the child's sexual abuse.

In addition, a visitation supervisor with Horizon Family Services testified that the mother interacted well with the children and that her home was always clean Consequently, she thought the children should be returned to the mother, but she also admitted that she was not aware of the details of the reunification plan or whether the mother had fully complied with it. Similarly, two additional visitation supervisors, one with Horizons and the other with TLC Services, also testified that the mother interacted well with the children during visits and that the children wanted to return home.

Several of the children's current foster parents also testified. The foster parent for L. T. testified that the mother interacted well during visits, attended all of L. T.'s medical appointments, and, therefore, she believed L. T. should be returned to the mother's custody. The foster parent for T. Y. similarly testified and also advocated for reunification. The foster parent for K. T. testified that the girl currently denies that Turner sexually abused her, but she also acknowledged that K. T. told several counselors that such abuse *had* occurred, and she admitted that she was unsure if K. T. would be safe if returned to the mother's custody. Additionally, the foster parent for A. T. testified that the mother interacted well with the child and attended all of his

medical appointments. But she, nonetheless, had concerns about returning A. T. to the mother's custody.

Three separate mental-health counselors testified as to their treatment of the mother. The first counselor stated that she was treating the mother for anxiety and depression and that she met one of her treatment goals and was making good progress toward the others. The counselor also stated that the mother had done well in her parenting classes, but, at this point, she was unable to provide an opinion as to whether the children should immediately be returned to her custody. The second counselor testified that the mother complied with her recommendations regarding parenting education but that she needed to continue undergoing education for dealing with T. Y.'s autism and K. T.'s sexual-abuse allegations. The counselor believed that the mother could care for the children if she complied with these recommendations and also advocated for A. T.'s immediate return so that the young child could bond with the mother. The third counselor testified that the mother was compliant and on target for meeting her plan goals. But the counselor did express concerns that the mother did not agree K. T. had been sexually abused and that she wanted her entire family to be reunited, including Turner.

The mother testified at the hearing and claimed she was continuing with mental-health counseling but had otherwise completed her case plan, including obtaining a stable home and income. She admitted lying to DFCS about her pregnancy with A. T., claiming that she was worried she would lose custody of the child. She further testified that she was unsure as to the cause of T. Y.'s bruises, but noted that she was the one who involved the police after discovering them. The mother also stated that she was not sure Turner had sexually abused K. T. or physically abused T. Y., but she was open to that possibility. Additionally, she testified that she did not believe Turner was guilty of vehicular homicide even though he pleaded guilty to that offense and she had visited Turner in jail on several occasions. Nevertheless, she claimed that she did not intend to reunite with Turner upon his release because being reunited with her children was more important.

Finally, despite the DFCS case worker's testimony recommending that the children be returned to the mother's custody, the case worker's supervisor disagreed. Specifically, the DFCS supervisor agreed that the mother had been complying with her case plan with regard to counseling, but the supervisor insisted that she still had not seen a significant change in behavior. The supervisor testified that she was particularly concerned by the mother's refusal to believe Turner had sexually abused

9

K. T., and that she continues to choose her husband over her children. For these reasons, the supervisor worried that the children will not be protected when Turner is eventually released from prison. The guardian ad litem agreed with this assessment, and, during the hearing, recommended that the juvenile court deny the mother's motion and increase visitation at a Court Appointed Special Advocates ("CASA") site.

At the conclusion of the hearing, the juvenile court took the matter under advisement. Then, on January 19, 2018, the court issued an order denying the mother's motion to have the children immediately returned to her custody. This appeal follows.

In analyzing an appeal from an order finding a child to be dependent, "we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent."[3] And in making

---

[3] *In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018) (punctuation omitted); *accord In the Interest of S. C. S.*, 336 Ga. App. at 244. The Juvenile Code was "substantially revised in 2013." *In the Interest of M. F.*, 298 Ga. 138, 140 (1) n.4 (780 SE2d 291) (2015). Importantly, the former Juvenile Code "authorized a juvenile court to award custody to the Department of any minor child shown to be 'deprived.'" *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4. But the current Juvenile Code "uses the word 'dependent' in lieu of 'deprived[.]'" *Id*. In this

this determination, "we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened."[4]

Notably, even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency "resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[5] Thus, only under compelling circumstances that are found to exist

---

case, DFCS filed its initial complaint in November 2015, such that the new Juvenile Code applies. *See* OCGA § 15-11-16 (a) (3) (providing that a proceeding under the new Juvenile Code "may be commenced . . . by the filing of a complaint or a petition as provided in Article[ ] 3 . . . of [the new Juvenile Code]," which governs dependency proceedings); *In the Interest of M. F.*, 298 Ga. at 140 (1) n.4 (noting that the new Juvenile Code applies to proceedings commenced on or after January 1, 2014). Nonetheless, given the similarities between the definition of a "deprived child" and that of a "dependent child," we find that "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4.

[4] *In the Interest of S. C. S.*, 336 Ga. App. at 245 (punctuation omitted).

[5] *In the Interest of A. J. H.*, 325 Ga. App. 848, 852 (755 SE2d 241) (2014) (punctuation omitted); *accord In the Interest of C. R.*, 292 Ga. App. 346, 351 (2) (665 SE2d 39) (2008).

by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship.[6] This is because "the right to the custody and control of one's child is a fiercely guarded right in our society and in our law."[7] Indeed, as our Supreme Court recently (and rightly) emphasized, the right of familial relations is "among the inherent rights that are derived from the law of nature."[8] And because of the sacred right at stake in custody proceedings, generally, the record must contain evidence of present dependency, not merely past or potential future

---

[6] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *accord In the Interest of H. S.*, 285 Ga. App. 839, 841 (648 SE2d 143) (2007); *In the Interest of A. J. I.*, 277 Ga. App. 226, 227 (626 SE2d 195) (2006); *In the Interest of S. J.*, 270 Ga. App. 598, 599 (607 SE2d 225) (2004).

[7] *In the Interest of H. S.*, 285 Ga. App. 839, 843-44 (648 SE2d 143) (2007) (punctuation omitted); *accord In the Interest of A. J. I.*, 277 Ga. App. at 230.

[8] *Patten v. Ardis*, 304 Ga. 140, 141 (2) (816 SE2d 633) (2018); *accord Sloan v. Jones*, 130 Ga. 836, 847 (62 SE 21) (1908), *superseded by statute on other grounds*; *Moore v. Dozier*, 128 Ga. 90, 93-94 (57 SE 110) (1907); *In Interest of G. M.*, 347 Ga. App. 487, 491 (819 SE2d 909) (2018); *see generally In the Interest of R. B.*, 346 Ga. App. 564, 571-76, 816 S.E.2d 706 (2018) (Dillard, C. J., concurring fully and specially).

dependency.[9] Finally, the party who brings the petition alleging dependency, not the parent from whose custody the child is being removed, carries the burden of proof.[10]

With these overarching and guiding principles in mind, we turn now to the mother's enumerations of error.

1. The mother argues the juvenile court erred in finding that DFCS established by clear and convincing evidence that her children were dependent, and that such dependency was likely to continue. But deficiencies in the juvenile court's order prevent this Court from conducting a meaningful review of the mother's contentions.

OCGA § 15-11-2 (22) defines a "dependent child" as one who, *inter alia*, "[h]as been abused or neglected and is in need of the protection of the court." OCGA § 15-11-2 (2) (A) and (B) define the term "abuse" as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; [or] . . . [e]motional abuse. . . ." And OCGA § 15-11-2 (48)

---

[9] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *accord In the Interest of R. S. T.*, 323 Ga. App. 860, 863 (748 SE2d 498) (2013).

[10] *In Interest of G. M.*, 347 Ga. App. 487, 491 (819 SE2d 909) (2018); *In the Interest of T. P.*, 291 Ga. App. 83, 85-86 (3) (661 SE2d 211) (2008); *see* OCGA § 15-11-180 ("The petitioner shall have the burden of proving the allegations of a dependency petition by clear and convincing evidence.").

13

defines "neglect" as, *inter alia*, "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; [or] . . . [t]he failure to provide a child with adequate supervision necessary for such child's well-being[.]"

The factors to be considered in determining whether a child is without proper parental care or control include "[e]gregious conduct or evidence of past egregious conduct of a physically, emotionally, or sexually cruel or abusive nature by [a] parent toward his or her child or toward another child of such parent."[11] Furthermore, consideration of past misconduct is "appropriate because the juvenile court is not required to reunite a child with a parent in order to obtain current evidence of deprivation or neglect."[12] But the record must contain evidence of "present dependency, not merely past or potential future dependency."[13] Additionally, a finding of parental unfitness is "essential to support an adjudication of present

---

[11] OCGA § 15-11-311 (a) (4).

[12] *In the Interest of H. B.*, 346 Ga. App. 163, 165 (816 SE2d 313) (2018) (punctuation omitted).

[13] *Id.*

14

dependency."[14] And "unfitness" in this respect refers to "intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[15]

In this matter, the juvenile court apparently based its decision to deny the mother's motion for immediate reunification and return of the children to her custody on its belief that the mother would not protect the children from Turner once he is released from prison. But the juvenile court's order does not include findings of fact, separate from its apparent conclusions of law, in a manner that would permit us to make an intelligent or meaningful review of the challenges to the sufficiency of the evidence.

OCGA § 15-11-111 (b) (2) provides: "The court's order . . . [s]hall include findings of fact which reflect the court's consideration of the oral and written testimony offered by all parties, as well as nonparties, who are required to be provided with notice and a right to be heard in any hearing to be held with respect to a child, and DFCS." And such findings of fact should be made in accordance with OCGA § 9-11-52 (a), which provides that a court must "find the facts specially and

---

[14] *Id.*

[15] *Id.* (punctuation omitted).

. . . state *separately* its conclusions of law."[16] Consequently, the facts must be found specially; "and the conclusions of law must be stated separately, regardless of whether the order otherwise is sufficient for purposes of review."[17]

Here, the juvenile court's order does not comply with these statutory requirements. Although the order recites much of the evidence after noting that "it finds as follows[,]" ultimately it fails to indicate which facts support its conclusion.[18] More importantly, although the court reaches a conclusion to deny the mother's motion, "it intermingles findings of fact and conclusions of law rather than stating them separately as required by OCGA § 9-11-52 (a)."[19] Indeed, completely absent from the juvenile court's order is any discussion of facts of the case within the context of the applicable statutes, the standard of review, or governing case authority. Given these particular deficiencies, we cannot make an intelligent or meaningful

---

[16] (Emphasis supplied).

[17] *In the Interest of B. G.*, 345 Ga. App. 167, 168 (1) (812 SE2d 552) (2018) (punctuation omitted).

[18] *See id.* (holding that "findings of fact are not intended to amount to a brief of the evidence, and a mere recitation of the events that took place at the trial does not satisfy the requirements of OCGA § 9-11-52 (a)" (citation & punctuation omitted)).

[19] *Id.* at 169 (1).

16

review of the mother's contentions on appeal.[20] Accordingly, we vacate the trial court's ruling denying the mother's motion for immediate reunification and return of the children to her custody and remand this case to the juvenile court with direction that it prepare appropriate findings of fact and conclusions of law.[21] Upon the entry of a new judgment, the non-prevailing party may appeal.

*Judgment vacated and case remanded with direction. Gobeil and Hodges, JJ., concur.*

---

[20] *See id.* at 168-69 (holding that juvenile court's intermingling of findings of fact and conclusions of law prevented appellate review of relatives' challenge to the sufficiency of the evidence supporting the court's nonreunification order).

[21] *See id.* at 169 (1) (vacating juvenile court's order lacking sufficient findings of fact and conclusions of law and remanding case to the court for further proceedings); *see also In the Interest of D. M.*, 339 Ga. App. 46, 55-56 (2) (a) (793 SE2d 422) (2016) (vacating and remanding termination case to the juvenile court in light of court's failure to include specific findings of fact and conclusions of law in its order).