648 S.E.2d 143 (2007)
In the Interest of H.S., a child.
No. A07A0810.
Court of Appeals of Georgia.
June 14, 2007.
*144 Kelley & Snow, Julia E. Snow, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Clark & Bellamy, Andrew W. Clark, Thomasville, Kenneth D. Steele, Bonnie R. Spears, for appellee.
MIKELL, Judge.
The biological father of a nine-year-old girl, H.S., appeals the Juvenile Court of Thomas County's order finding H.S. deprived and awarding temporary custody to the Thomas County Department of Family and Children Services ("DFCS") and physical custody to H.S.'s maternal great aunt and great uncle. Appellant argues that the order is erroneous because there was no evidence that he was unfit. Because there was no clear and convincing evidence that appellant was unfit, we reverse.
"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [child was] deprived."[1] In doing so, we neither weigh the evidence nor determine the credibility of witnesses; instead, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.[2] So viewed, the evidence adduced at the deprivation hearing showed that DFCS sought emergency custody of H.S. because H.S.'s mother, who was entering a drug treatment program, was concerned that appellant, who resided in Mississippi, would come to pick up H.S. while she was in treatment. The mother was present at the deprivation hearing but did not testify.
Diane Adams, the DFCS investigator who made the request for the emergency removal of H.S., testified that according to the mother, H.S. had observed domestic violence between the mother and appellant in their home in Mississippi; that the domestic violence had begun the night of their honeymoon; and that the mother left Mississippi with H.S. because appellant had grabbed H.S.'s arms, preventing her from going for help during an incident when he was pulling the mother around the yard by her hair. Adams further testified that the mother did not show up for the treatment program but had returned to Mississippi and was spending some time with appellant.
Adams also testified that she interviewed H.S., who confirmed the incident discussed by the mother and said that appellant hurt her arms when he prevented her from going for help. Adams recounted H.S.'s statements that her father would periodically slap her on the top of her head for no reason and that she had observed domestic violence. Adams explained that H.S. had been placed with her aunt and uncle, with whom she and her mother lived when they moved from Mississippi, and where H.S. had lived the first year and a half of her life because her mother tested positive for drugs at H.S.'s birth, and that the home had been approved by DFCS.
On cross-examination, Adams admitted that she had not requested psychological reports on H.S., evaluated the father for placement, or checked the records in Mississippi for reports of abuse. According to Adams, appellant confirmed that there was a domestic violence incident five years earlier and one before the mother moved. Adams did not investigate whether there were any pending charges against appellant.
H.S. testified that she was living with the aunt and uncle because her parents got into a fight during which appellant grabbed her mother around the neck twice. H.S. also testified that her father grabbed her arms, leaving a red mark, when she tried to run to get help for her mom, and that he had previously slapped her on the head a few times. On cross-examination, H.S. testified that *145 when her father slapped her on the head, she had been running in the house; that when her father grabbed her arm during the incident with her mother, he let her go soon thereafter; and that she had seen her parents smoking "pot," and that she knew what it was because she described it to Tamela Wooten, a counselor at her school.
According to Wooten, H.S. told her that she misses her mother and wants her to get better and that her father hurts her mother and does drugs, which she described to Wooten as "brown crumply stuff." Wooten recalled that H.S.'s aunt was in the room when H.S. talked about her parents doing drugs, and the aunt suggested that the substance was "pot."
Appellant testified that he was in the process of remodeling a trailer home that he inherited from his grandfather, which was parked on 40 acres of land owned by his family in Mississippi, on which his mother and father also lived; that his wife left after an incident in which she came home drunk, which led to a shoving match and her threat to leave; that he told her that she was not leaving because she was drunk and squirted her with a water hose to sober her up and to try to keep her from driving away with his daughter; that the mother left with H.S. two months later; that he did not touch H.S. or her mother during the incident; that several years earlier, he was charged with domestic violence because he and H.S.'s mother had a physical altercation and when the police arrived, they had to take one of them to jail, and he volunteered to go; and that he had never struck H.S. but that he had playfully wrestled with her because she loved to wrestle. Appellant also testified that he had been employed by the same cable company for eight years; that he wished his wife would conquer her drug addiction; that he smoked marijuana and drank alcohol in the past; that he paid child support while H.S. was in Georgia; and that, initially, he and H.S. talked every time he called her at her aunt's house but by the time of the hearing, she was refusing his calls.
Pursuant to OCGA § 15-11-2(8)(A), a deprived child is one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[3] "But a finding that a child is deprived does not necessarily result in a loss of custody by the parent."[4] It has been held that
[t]o authorize even a loss of temporary custody by a child's parent on the basis of deprivation, the deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.[5]
Furthermore, "[p]roof of unfitness must be shown by clear and convincing evidence [as] this standard recognizes the importance of the familial bond and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior."[6] It follows that "[o]nly under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship."[7] Reviewed in the light most favorable to the juvenile court's judgment, we find that the evidence was insufficient to establish clearly and convincingly that H.S. was a deprived child within the meaning of Georgia law.
The juvenile court's grant of the deprivation petition was based on two factors related to appellant. The court relied on the "history" of domestic violence between appellant *146 and his wife. But the only evidence of a "history" of domestic violence was the hearsay statement of the mother testified to by Adams. The mother did not testify, and the state did not establish through the child's testimony that she had witnessed a history of domestic violence. "[I]t is well settled that hearsay lacks probative value, even if unobjected to."[8] The evidence shows that the child witnessed one incident of domestic violence. H.S. testified that appellant grabbed her mother around the neck and dragged her through the yard. Appellant denied the conduct alleged by H.S., but explained that one afternoon when he came home, his wife was drunk and wanted to drive herself and H.S., and he squirted his wife with water because he did not want her to drive while inebriated. The evidence is undisputed that the wife had a substance abuse problem. Even if we assume that this incident happened as H.S. described, the state offered no evidence that H.S. was harmed as a result.[9]
The trial court also found that "[t]he child has alleged physical abuse by her father as part of the incidents of domestic violence . . . and reported that her father `grabbed her by the neck,' `drug her around the yard', and `hit her on the head.'" It appears that the court misunderstood the testimony. H.S. did not testify that her father grabbed her by the neck and dragged her in the yard. She testified that her father grabbed her arm momentarily while he and her mother were fighting. Regarding the court's finding that appellant hit H.S. on the head, H.S. admitted that he had hit her on her head a couple of times when she was running through the house. The state did not offer evidence that this contact occurred in connection with domestic violence, as the trial court suggests. Again, the state offered no evidence that H.S. suffered any emotional or physical harm, which would support a finding of intentional or unintentional misconduct resulting in the abuse or neglect of the child.
In In the Interest of C.L.Z.,[10] we reversed a finding of deprivation, finding no clear and convincing evidence of deprivation where witnesses testified to a single incident in which the appellant grandmother physically abused a four-year-old child by repeatedly pushing her into the side of a vehicle, because the state offered no evidence that the child suffered emotional or physical harm from the incident or that the grandmother routinely had difficulty controlling her anger.[11] Similarly here, the state offered no evidence that H.S. was harmed, or that appellant routinely subjected H.S. to mental or physical abuse. Therefore, appellant's isolated, although perhaps inappropriate, conduct did not warrant a finding of deprivation under these circumstances.[12] In In the Interest of C.D.E.,[13] we reversed a finding of deprivation where the trial court based its ruling on the father's acts of domestic violence against the wife and its conclusion that the father was a "walking time bomb," in part because of the lack of evidence as to the effect of the father's behavior on the children.[14] We held that
[t]he issue in a deprivation hearing involving a transfer of custody . . . is not whether the parent has committed illegal acts, but whether there is intentional or unintentional misconduct resulting in the abuse or neglect of the child or what is tantamount to physical or mental incapability to care for the child. Even where the parent has been convicted and incarcerated for commission of a felony, a finding of parental unfitness must be based on a showing that there is a demonstrable negative effect *147 on the quality of the parent-child relationship.[15]
The evidence here is that appellant and his child had a good relationship, which changed at some point after she and her mother moved from Mississippi. Appellant is gainfully employed, lives on 40 acres of land owned by his family, and is supported by his family in his quest for custody of his daughter.
While this court is mindful of the fact that the DFCS caseworkers are charged with the safety and security of the most vulnerable among us, and in this laudable yet unenviable position are required to make at times alacritous decisions, as this court has noted previously, the right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances.[16]
We do not find that such circumstances existed here.
Judgment reversed.
JOHNSON, P.J., and PHIPPS, J., concur.
NOTES
[1] (Punctuation and footnote omitted.) In the Interest of G.G., 253 Ga.App. 565, 560 S.E.2d 69 (2002).
[2] In the Interest of B.M.B., 241 Ga.App. 609, 527 S.E.2d 250 (1999).
[3] (Punctuation and footnote omitted.) In the Interest of M.L.C., 249 Ga.App. 435, 436(2), 548 S.E.2d 137 (2001).
[4] (Footnote omitted.) In the Interest of E.M., 264 Ga.App. 277, 590 S.E.2d 241 (2003).
[5] (Footnote omitted.) In the Interest of D.N.K., 282 Ga.App. 430, 433-434(1), 638 S.E.2d 861 (2006). Accord In the Interest of G.S., 279 Ga. App. 89, 91-92, 630 S.E.2d 607 (2006).
[6] (Punctuation and footnote omitted.) In the Interest of C.L.Z., 283 Ga.App. 247, 249, 641 S.E.2d 243 (2007).
[7] (Citation omitted.) In the Interest of A.J.I., 277 Ga.App. 226, 227, 626 S.E.2d 195 (2006).
[8] (Footnote omitted.) In the Interest of E.C., 271 Ga.App. 133, 135(1), 609 S.E.2d 381 (2004).
[9] See generally In the Interest of A.J.I., supra at 230, 626 S.E.2d 195 (no evidence that mother's drug use had an adverse effect on children); In the Interest of M.L.C., supra at 437-438, 548 S.E.2d 137 (where there was little evidence of adverse effect on child, deprivation finding reversed even though parents admitted to depression, substance abuse, and incidents of domestic violence).
[10] Supra.
[11] Id.
[12] Id.
[13] 248 Ga.App. 756, 546 S.E.2d 837 (2001).
[14] Id. at 762-766(2), 546 S.E.2d 837.
[15] (Punctuation and footnotes omitted.) Id. at 767(2), 546 S.E.2d 837.
[16] (Citation and punctuation omitted.) In the Interest of K.S., 271 Ga.App. 891, 894, 611 S.E.2d 150 (2005).