**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 21, 2013**

# In the Court of Appeals of Georgia

A13A0779. In The Interest of S. M. et al., children.

MCMILLIAN, Judge.

The mother of S. M., T. S. and B. S. appeals the juvenile court's order finding the children to be deprived and placing them in the temporary custody of the Department of Family and Children Services ("DFACS"). We reverse because we find that the record lacks clear and convincing evidence to support the trial court's determination that the children were deprived within the meaning of OCGA § 15-11-2 (8) (A).

"In considering an appeal from the juvenile court's deprivation order, we review the evidence from the juvenile court hearings in the light most favorable to the court's judgment and determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived." (Citation and

punctuation omitted.) *In the Interest of D. W.*, 318 Ga. App. 725 (734 SE2d 543) (2012).

The juvenile court entered orders for shelter care for each of the children on August 29, 2012, in response to complaints filed by DFACS, which alleged that the mother's live-in boyfriend[1] had pulled a gun on the mother and hit her with an object. The orders indicate the children reported that other instances of domestic violence had occurred, that the boyfriend was often physically aggressive toward them, and that he was frequently intoxicated. DFACS filed a deprivation petition on September 4, 2012, and the next day, following a hearing, the juvenile court issued an order finding probable cause that the children were deprived. The order transferred custody of the children to DFACS, pending an adjudicatory hearing. The juvenile court conducted the adjudicatory hearing on DFACS' deprivation petition on September 27, 2012.

At the hearing, Amber Jones, a counselor at the elementary school attended by S. M. and T. S., testified that on the morning of August 29, 2012, she was contacted

---

[1] The boyfriend is not the biological father of any of the children.

by an assistant principal who indicated that S. M. had reported that her "father"[2] had pulled a gun on her mother that morning. Jones spoke with S. M., who said that as they were getting ready for school, her parents were arguing. At some point, her "father" pulled out a gun from beside the gray couch, where he kept it, and pointed it at her mother. He then instructed S. M. and T. S. to get in the car so he could take them to the school bus stop. While the children waited in the car, S. M. heard a gunshot and she did not know whether her mother was alive or dead. Jones then went to T. S.'s classroom to ask how she was doing. T. S. responded that her "father" had pulled a gun on her mother that morning. Jones observed that both girls appeared to be upset. Jones notified the sheriff's department about the girls' statements in order to determine whether the mother was okay.

Jones had made a previous referral to DFACS the year before, concerning the girl's continuous, "pretty severe" issues with hygiene. Jones spoke with the girls about how to bathe and on one occasion sent soap home with S. M., who told Jones they did not have soap at home because sometimes her "father" got mad and threw soap around. Jones also noted in her DFACS report that S. M. had told her about an

---

[2] The mother testified that when the children referred to their "father," they meant her live-in boyfriend.

incident, in which her younger brother, who was not in a car seat, had tried to open the car door, which led to a wreck involving the police.

Wendy Bearden, S. M.'s first grade teacher, testified that S. M. told her first thing on the morning of August 29, 2012 that her "daddy's going to kill my mama when I go to school today." She also said that her "father" had hit her mother with her breakable baby doll, but she did not mention a gun. Bearden said that the situation was worrying S. M., and she acted afraid until she was reassured that her mother was okay.

Bearden also said that S. M. frequently asked to go to the school nurse, because she appeared to like the individual attention the nurse would provide. Bearden stated that due to a "small odor," the school had previously sent shampoo home with S. M. and T. S. "so that they could shampoo their hair and take better care of themselves."

S. M., who was seven, testified that she was not allowed to call her mother's boyfriend by his name, so she called him her "dad" instead. During S. M.'s testimony, the attorney for DFACS asked how her mother's boyfriend treated her, and she replied that "sometimes" he is good. She said that her mother told her that the boyfriend had bought her brother a four-wheeler and that S. M. and her sister would be getting dolls and a puppy. When the attorney began to question S. M. about the

4

four-wheeler and the dolls, she volunteered, "It's the truth. My dad, he don't have no gun." S. M. said that her mother told her that she was in court that day to tell the truth that her "dad" did not have a gun. She said that her "dad" used to have a gun that he kept beside the gray couch, but when she saw her mother at the doctor's office (after she went into DFACS custody) her mother told her that they had given the gun away. At one point, S. M. admitted telling Jones about the gun, but later denied doing so. She also said that she heard a gunshot but said she heard it when she was in bed the night before.[3] S. M. said that her "dad" did not hurt her mother, but another man did. She also said that her mother and "dad" never fought.

T. S., who was six, testified that S. M. "told a fib" when she said the boyfriend pointed a gun at her mother, and S. M. told T. S. to tell a "fib" about it. T. S. told her teacher that the boyfriend had pointed the gun, but that was not true. T. S. said she was in court at the hearing because S. M. told a fib. She said her mother told her at the doctor's office that she would get to see a puppy when she got to go home.

---

[3] S. M. said the gunshot occurred when a neighbor shot a bear in the woods, and one of her neighbors died. On cross-examination, she said that when the gunshot occurred, her mother was laying on the ground, covered with grass and bleeding, and a tornado was coming. She then said that someone "metal" tried to eat her mother and she kicked them.

Lieutenant Stephens of the Whitfield County Sheriff's Department testified that on August 29, 2012, another officer and he responded to the children's report about a gunshot at the mother's home. When he arrived, the mother was there with a small child. When Stephens asked the mother what had happened, she said "just a small argument, nothing to it." The officers did not observe anything out of the ordinary when they checked the house. The officers did not even file a report because they believed the allegations were unfounded.

The mother testified and denied that her boyfriend had pulled a gun the morning of August 29, 2012. She asserted that the boyfriend and she were not even arguing that morning. The mother said that S. M. had a habit of making up stories, and she speculated that S. M. "put [T. S.] up to saying" that the boyfriend had pulled a gun, probably because S. M. did not want to go to school that day. The mother said that T. S. recanted her story that morning when the mother went to the school. She also said that the only gun the boyfriend had was an antique BB gun that had belonged to his father, which was not operable. The mother said he kept that gun up in a closet, away from the children.

The mother, who did not work, had lived with the boyfriend for four to five years at the time of the hearing. He supported the family as a diesel mechanic, and the

6

mother had no other way to support her children at that time, although she believed she could get a job if needed. The family did not receive food stamps, and the only public assistance they received was Medicaid for the children. The mother stated that she was unaware of any hygiene issues with her girls; she said the girls took daily baths, always had clean clothes and brushed their hair.

In his testimony, the boyfriend acknowledged that he had a prior criminal record, including several charges of domestic violence involving his ex-wife. But he said that he no longer drank and that the mother and he had no problems. Because the boyfriend had a prior felony conviction for possession of a firearm, he did not keep a firearm in his house, although he kept his father's old BB gun in the closet. He said that no argument occurred between the children's mother and him on the morning of August 29, 2012 and that he did not pull a gun on her. The boyfriend said that S. M. had previously pretended to be sick to get out of school.

At the close of the evidence, the guardian ad litem cited the gravity of the children's allegations, the conversation between the mother and children at the doctor's office since the incident, and the discrepancies in the evidence in expressing her concern for the children's safety if they were returned to the home.

7

The juvenile court subsequently entered a "Provisional Temporary Placement Order" finding the children to be deprived and granting DFACS temporary legal custody. The juvenile court based its order of deprivation on its evidentiary finding that the mother repeatedly perjured herself, noting that both the mother and the boyfriend had denied "so much as an argument occurred that morning," which "contradict[ed] what the mother told the law enforcement officer dispatched to the residence" on the morning of the incident. The juvenile court further found that the mother perjured herself "about the events of the day in question," "about the events at the doctor's office visit[] when she saw the children," "about where in the home the gun was located," and "about the hygiene issues with the children." Thus discounting the mother's testimony, the juvenile court found that "[the boyfriend] and the mother argued, he pulled a gun on her, and the children believed they heard a gunshot after they were made to leave the home[] and went to school not knowing whether or not their mother had been shot." The court found that keeping the children in the home would be contrary to their welfare based upon these events and the fact the mother denies that they happened, placing the children in danger if they returned.

Under Georgia law, a deprived child is a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or

8

control necessary for the child's physical, mental, or emotional health or moral[s]." OCGA § 15-11-2 (8) (A). "In determining whether a child is deprived, the court focuses upon the needs of the child rather than parental fault." *In the Interest of J. H.*, 310 Ga. App. 401, 401-402 (713 SE2d 472) (2011). And where, as here, the children already were in DFACS's custody, "the correct inquiry [for the juvenile court was] whether the children *would be* deprived if returned to the parent's care and control as of the date of the hearing." (Citation omitted and emphasis in original.) *In the Interest of C. H.*, 305 Ga. App. 549, 559 (2) (a) (700 SE2d 203) (2010).

But even after finding a child to be deprived, a juvenile court can only remove a child from a parent's custody, if it finds that "the deprivation resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." *In the Interest of J. H.*, 310 Ga. App. at 402. And "[p]roof of unfitness must be shown by clear and convincing evidence; this standard recognizes the importance of the familial bond and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior." (Citation and punctuation omitted.) *In the Interest of C. L. Z.*, 283 Ga. App. 247, 249 (641 SE2d 243) (2007).

9

We find the case of *In the Interest of C. L. Z.* to be instructive on the issue of parental unfitness. There, several witnesses in a public parking lot observed C. L. Z.'s grandmother, who was her guardian, yelling at her, tying a sweater over the child's eyes as a blindfold, pushing the back of her head to make her turn around, and in the process, pushing her face into the side of a car. *C. L. Z.*, 283 Ga. App. at 247-248. Following this incident, the juvenile court adjudicated C. L. Z. as a deprived child, but this Court reversed, noting that the parking lot incident was "[t]he only incident of physical and emotional abuse cited by the juvenile court." Id. at 249. Moreover, "[o]ther than testimony that C. L. Z. was crying, the State offered no evidence that she suffered any emotional or physical harm from the incident," nor did the State present any evidence to show that the grandmother had mental, emotional or anger issues. (Footnote omitted.) Id.

Thus, the Court found that "[t]he evidence presented did not show that this was anything other than an isolated, albeit highly inappropriate, outburst by the grandmother." The Court concluded that "[w]hile [it could not say] that these facts would never merit a finding of deprivation, under these circumstances, where the State has failed to demonstrate harm to [the child], clear and convincing evidence of deprivation has not been established." (Citation omitted.) Id. See also *In the Interest*

10

*of H. S.*, 285 Ga. App. 839, 842–843 (648 SE2d 143) (2007) (reversing deprivation finding where child witnessed one incident of domestic violence between mother and father during which the father grabbed child's arm and father had hit child on the head on "a couple" of other occasions when she ran through the house, but no evidence these incidents had a negative impact on child); *In the Interest of T. L.*, 269 Ga. App. 842, 843-846 (2) (605 SE2d 432) (2004) (reversing finding of deprivation in absence of evidence showing how child was negatively impacted by "filthy" and cluttered conditions in home); *In the Interest of M. L. C.*, 249 Ga. App. 435, 436-439 (2) (548 SE2d 137) (2001) (reversing finding of deprivation where parents admitted to substance abuse, depression, and incidents of domestic violence but no evidence presented showing adverse impact on child and neighbors testified that they were "wonderful" parents).

In this case, discounting the mother's testimony and adopting the trial court's factual findings, the record demonstrates only a single,[4] "albeit highly inappropriate" incident in which two of the children observed the boyfriend pull a gun on the mother and believed that they heard a gunshot. As a result, they went to school not knowing

---

[4] Although the girls' school made a referral to DFACS one year earlier due to their hygiene issues, the record contains no evidence that DFACS investigated or opened a case on the family at that time.

11

whether their mother was alive or dead. No evidence was presented that B. S., the third child, was even aware of the incident. Other than evidence that S. M. and T. S. were understandably upset that morning at school, the State provided no evidence that the children suffered any emotional or physical harm from the incident or that it had any other effect on them. Although some evidence existed of physical abuse between the boyfriend and his ex-wife, and Jones said that S. M. told her that the boyfriend had been angry and intoxicated on prior occasions, the State presented no evidence of any other instances of physical abuse between the boyfriend and the mother. Notably, the State presented absolutely no evidence of any physical, emotional or mental abuse of the children.[5] And even though the trial court further found that the mother lied on the stand and failed to admit that the incident had occurred,[6] the State failed to demonstrate how such behavior in the court proceedings would negatively impact the children if they were returned to the mother's home.

---

[5] We note that the evidence at the hearing did not support the juvenile court's findings in the shelter care orders of other instances of domestic violence or physical aggressiveness.

[6] Although the evidence suggested that the mother may have tried to influence her children's testimony with the promise of dolls and a puppy, the juvenile court made no findings in this regard and did not rely upon this evidence (other than noting that the mother had lied about it) in making its finding of deprivation.

12

Thus, even viewing the record in the light most favorable to the trial court's finding of deprivation and acknowledging the serious nature of the incident at issue, we find that the record in this case lacks clear and convincing evidence to support the trial court's finding that the girls were deprived within the meaning of the law.

*Judgment reversed. Andrews, P. J., and Dillard, J., concur.*