**FIFTH DIVISION**
**DOYLE, C. J.,**
**DILLARD, P. J. and BETHEL, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 28, 2017**

# In the Court of Appeals of Georgia

A16A2170. IN THE INTEREST OF A. W., a child.                    DO-039

DOYLE, Chief Judge.

The Lowndes County Juvenile Court entered an order finding five-year-old A. W. dependent as to her mother, and the court awarded custody of the child to the Lowndes County Department of Family and Children Services ("the Department").[1] The mother now appeals, arguing that the Department failed to establish by clear and convincing evidence that (1) A. W. was dependent, or (2) A. W. should have been taken from the mother's custody during the pendency of the case. For the reasons that follow, we reverse.

---

[1] To the extent that the juvenile court has made a dependency determination as to the child's father, who has not legitimated the child, his case is not before us at this time.

[O]n appeal from a [dependency] order, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of [dependency]. In this review, we do not weigh the evidence or determine the credibility of witnesses; instead we defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met.[2]

The record shows that early in the morning on June 15, 2015, the mother was under the influence of methamphetamine when she threatened to shoot the father in his private area with her handgun because she believed he was unfaithful. Police responded to the incident, and the mother was charged with aggravated assault with a deadly weapon; the father was charged with possession of methamphetamine and possession of tools for the commission of a crime. During the incident, A. W. was not at the parents' home and was in the care of the mother's brother's 20-year-old significant other, K. W., at K. W.'s nearby home. When police arrived on the scene of the incident, the father, who also was under the influence of methamphetamine,

---

[2] (Footnotes and punctuation omitted.) *In the Interest of G. R. B.*, 330 Ga. App. 693, 698 (769 SE2d 119) (2015). See also *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016).

was at the couple's home; the mother had fled to K. W.'s house a few minutes earlier when the police were called.

After an emergency hearing, the trial court found probable cause to find A. W. was dependent and placed her in temporary care of the Department pursuant to OCGA § 15-11-146 (a). The Department filed a dependency petition, alleging that A. W. should be brought into protective custody because "the agency [could] not ensure [her] safety in her mother's care" based on the June 15 incident.

At the dependency petition hearing,[3] Department case manager Gwendolyn Larkin testified to the events leading to A. W. coming into care. Larkin testified that the mother admitted to having used methamphetamine over the course of approximately six weeks, culminating in the June 15 domestic violence incident between her and the father. Larkin testified that the mother explained that she and the father "usually get along fine[,] . . . and the incident was most likely a result of [her] drug use." Larkin testified that A. W. was not at home the night before or the day of

_____

[3] An untranscribed hearing was held on June 23 at which the mother and K. W. testified. Some of that testimony was summarized at the later hearing on July 7 from which these facts are taken.

the domestic violence incident,[4] and she testified that A. W. was at K. W.'s residence. Larkin testified that the basis of the dependency complaint against A. W. was that "there was nobody to keep [A. W.] while [the mother] was in jail."

With regard to family placement, Larkin testified that the maternal grandmother was not an appropriate placement because she previously used methamphetamine, resulting in a three-year prison sentence and causing the mother to be removed from the grandmother's care when the mother was a teenager.[5] Larkin provided no testimony as to the maternal grandmother's current sobriety or lack thereof, her current housing or employment situation, or her current ability to provide appropriate care for A. W.

Larkin testified that K. W. was not an appropriate placement because the Department opened a case on her as a result of this incident based on K. W.'s father and his girlfriend's use of methamphetamine around K. W.'s home. Larkin testified that the "abuse and neglect" she alleged against K. W. in that case was that she "should have been more protective than to allow people who use drugs to be around

_____

[4] This testimony is contrary to a statement contained in the Department's emergency custody petition, but the parties all agree at this point that A. W. was not in the home where the incident occurred.

[5] The paternal grandmother declined to act as a placement for A. W.

her children. At the time, we didn't know if her dad was supervising these children or what." No evidence was presented that K. W. used any narcotics or that she allowed her father or any other person to supervise or interact with the children in her care. Larkin also testified that K. W. was not a possible placement (aside from the Department's open case) because "she's [twenty]. She has two kids of her own. Her boyfriend that lives there is not there really to help her." In response to a question on cross-examination, Larkin admitted it was K. W.'s age that made her an inappropriate placement.

Larkin presented no testimony or other evidence about any physical injury of A. W., any specific instance of neglect, any sexual abuse, or observation by the child of any family violence,[6] and with regard to emotional or psychological injury, Larkin stated that "the child [told] me that mom and dad argued all the time. The child told me that she doesn't like that." Nevertheless, Larkin presented no evidence that the parents' arguments in front of the child were violent or caused any emotional or psychological harm beyond displeasure. With regard to drug use, Larkin testified that

---

[6] The record is also devoid of testimony that A. W. witnessed any drug use by the mother or negative behaviors the mother exhibited that were associated with any drug use, although that specific question was not asked of Larkin on cross-examination.

"there is a risk to children whose parents are intoxicated on methamphetamine," but she did not expand on what that general risk was or provide any detailed testimony about specific harm to A. W. in this case.

The law enforcement officer who responded to the June 15 incident stated that the father, who also allegedly was intoxicated on methamphetamine at the time and acting erratically, told him that the parents

> were engaged in an argument and he — or she believed that he was cheating on her. He stated that she was seeing needles coming out of his arms, tattoos of other girls' names on his neck of which he had none, and at some point during that argument he — she had drawn a 9 millimeter Smith and Wesson, pointed at him and threatened to shoot his penis off.

A parent aide from a Department service provider testified that she performed a drug screen on the mother on June 18, which tested positive for methamphetamine/amphetamine, which the mother claimed was a result of her last methamphetamine use on June 15 prior to the domestic violence incident. On June 23, another aide from the service provider performed a drug screen of the mother, which was negative. The record before us also shows that the mother's subsequent drug screens were negative.

6

The mother testified at the hearing and denied using methamphetamine from the date of the incident until the dependency hearing on July 7, 2015. She admitted to having used methamphetamine for about six weeks prior to the incident, but she denied having used methamphetamine or having been arrested prior to that time frame. The mother testified that she and the father had been in a relationship for approximately eight years, A. W. was their only child, and she had no other children. She testified that she does not work, but the father is a traveling welder who makes about $10,000 per month when he is working about ten months out of the year; she and A. W. travel with the father when he is working. She denied doing methamphetamine in front of A. W., usually leaving her in the care of the maternal grandmother or K. W. when she was using, and the mother was willing to submit to drug screens and to attend drug treatment. The mother admitted to owning a 9-mm handgun, which she normally kept on her person or stored in a bed-side table at night. There was no evidence that A. W. ever handled or had access to the weapon. The mother testified that she and the father had obtained the methamphetamine from her father ("the grandfather"), but he did not currently live with the grandmother and was a truck driver who visited her when he was not working. She also admitted that her

7

parents' drug use had a negative impact on her life, but she did not provide detailed testimony in this regard.

K. W. testified that she was a stay-at-home mom whose husband was a traveling pipe-fitter. She watched A. W. frequently over the month or so prior to the hearing, usually so her own daughter had a playmate; she testified that she never saw the mother appear intoxicated from drug use. K. W. testified that she and the children (including A. W., who had come over on June 14) were asleep when the mother came to her home on June 15 prior to her arrest; K. W. testified that A. W. did not awaken during the mother's arrest. With regard to the Department's contention that K. W.'s father was using methamphetamine around her children and A. W., K. W. testified that he had been living in her portable storage shed in her backyard for one or two weeks prior to the incident; she was unaware that he used methamphetamine at that time; and she evicted him from her property on June 16 after the Department removed A. W. on the basis that his presence prevented her from serving as family placement for A. W. K. W. testified that she was not aware the Department was going to open a case against her until after she testified at the emergency hearing on June 23, at which point she had already prohibited her father from coming to her property. K. W. testified that her father did have a history of drug use, which is why she did not allow

8

him to live inside her house when he sought her assistance with housing, but she was not aware that he was using at the time she told him he could live in her shed.

After the hearing, the juvenile court entered an order on August 12, 2015, nunc pro tunc to July 7, 2015, finding that based on the mother's use of methamphetamine and the June 15 domestic violence incident, the mother had failed to ensure a safe environment for A. W., and her drug use had a negative effect on A. W. The trial court found that A. W. was abused or neglected on the basis of the drug use, that A. W.'s return to the mother was contrary to her welfare because of substance abuse, and the Department had made reasonable efforts to eliminate the need of removal of A. W. from the home or extended family.

1. The mother contends that the trial court erred by finding that A. W. was dependent because there was not clear and convincing evidence of her abuse or neglect. We agree.

As an initial matter, the mother contends that the trial court erred by finding that she had hallucinated as a result of any drug use.[7] The only reference to hallucinations are the hearsay statements of the father made to the officer after the

---

[7] The State's brief also alleges that the mother admitted she hallucinated; however, there is no record evidence of such an admission.

domestic violence incident. In addition to any lack of first-hand testimony, the father was under the influence of methamphetamine during the incident. Thus, there is a lack of clear and convincing evidence of any hallucination by the mother. Nevertheless, although the court cited this fact at the hearing as a reason it was finding that A. W. was dependent, this fact is not listed in the trial court's written order and is, therefore, not a cited reason supporting the adjudication of dependency.[8]

"Under the most recent version of Georgia's Juvenile Code, the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a dependent child."[9]

Pursuant to OCGA § 15-11-2 (22),[10] a dependent child is defined as "a child who: (A) Has been abused or neglected and is in need of the protection of the court[;] (B) Has been placed for care or adoption in violation of law; or (C) Is without his or her parent, guardian, or legal custodian." Nothing suggests that A. W. would fall

---

[8] See OCGA § 15-11-181 (e) ("After hearing the evidence, the court shall make and file specific written findings as to whether a child is a dependent child.").

[9] (Punctuation omitted.) *In the Interest of S. C. S.*, 336 Ga. App. at 244. See also OCGA §§ 15-11-150, 15-11-152, 15-11-180.

[10] Because the dependency petition was filed in 2015, the new Juvenile Code applies. See *In the Interest of S. C. S.*, 336 Ga. App. at 245, n.4, quoting Ga. L. 2013, p. 294, § 5-1.

under definitions (B) or (C), therefore, we focus on subsection (A), "A child who . . . has been abused or neglected and is in need of the protection of the court."[11]

(a) Abuse is defined as

(A) Any nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; (B) Emotional abuse; (C) Sexual abuse or sexual exploitation; (D) Prenatal abuse; or (E) The commission of an act of family violence as defined in Code Section 19-13-1 in the presence of a child. An act includes a single act, multiple acts, or a continuing course of conduct. As used in this subparagraph, the term 'presence' means physically present or able to see or hear.[12]

The single incident of family violence[13] for which evidence appears in the record was not committed in the presence of A. W., and A. W. suffered no physical

---

[11] OCGA § 15-11-2 (22) (A).

[12] OCGA § 15-11-2 (2).

[13] See OCGA § 19-13-1 ("As used in this article, the term 'family violence' means the occurrence of one or more of the following acts between past or present spouses, persons who are parents of the same child, parents and children, stepparents and stepchildren, foster parents and foster children, or other persons living or formerly living in the same household: (1) Any felony; or (2) Commission of offenses of battery, simple battery, simple assault, assault, stalking, criminal damage to property, unlawful restraint, or criminal trespass.").

11

injury. Thus, the only possible subsection of abuse in which the mother's actions could fall would be "(B) [e]motional abuse." Pursuant to OCGA § 15-11-2 (30),

> '[e]motional abuse' means acts or omissions by a person responsible for the care of a child that cause any mental injury to such child's intellectual or psychological capacity as evidenced by an observable and significant impairment in such child's ability to function within a child's normal range of performance and behavior or that create a substantial risk of impairment, if the impairment or substantial risk of impairment is diagnosed and confirmed by a licensed mental health professional or physician qualified to render such diagnosis.

There is no indication in the record of the extent or nature of the parents' arguments, which could range from bickering about household issues to screaming and using derisive language toward each other. Moreover, there is no indication in the record of an "observable and significant impairment" in A. W.'s "ability to function within [her] normal range of performance and behavior."[14] Neither is there evidence that the mother's use of methamphetamine led to any mental injury of A. W. Moreover, the evidence at the dependency hearing established that the mother had ceased using methamphetamine, intended to continue her disuse, and had taken all the steps asked of her by the Department in order to show that she no longer used the substance.

---

[14] OCGA § 15-11-2 (30).

12

Finally, there is no evidence that the mother's acts of leaving A. W. in the care of K. W. or the grandmother led to any mental injury or that it posed a substantial risk of harm of injury to A. W. Accordingly, the Department failed to carry its burden to present clear and convincing evidence of abuse to support a finding of dependency.[15]

(b) In pertinent part, the Code defines "[n]eglect" as "(A) [t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; [or] (B) [t]he failure to provide a child with adequate supervision necessary for such child's well-being . . . ."[16] This definition is similar to former OCGA § 15-11-2 (8) (A) (2013), which defined "a deprived child [as] a child who '[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals.'"[17]

In order to make this determination under the previous juvenile code, the court

---

[15] See OCGA § 15-11-180.

[16] OCGA § 15-11-2 (48).

[17] *In the Interest of S. M.*, 321 Ga. App. 827, 831 (743 SE2d 497) (2013).

focused on the needs of the child rather than parental fault. "And where, as here, the [child is in the Department's] custody, the correct inquiry for the juvenile court was whether the [child] would be deprived if returned to the parent's care and control as of the date of the hearing."[18]

In this case, the Department also failed to present clear and convincing evidence that A. W. was neglected or that she would be neglected if she was returned to the mother.[19] First, during the period that the mother was using methamphetamine, the evidence shows no neglect of A. W., and to the extent that she allowed A. W. to stay in the homes of the grandmother or K. W., there is no evidence beyond speculation on the part of the Department that either of those individuals neglected or would neglect A. W.[20] While the lone instance of domestic violence between the mother and father certainly is serious, and while this Court does not condone the mother's use of methamphetamine during the six-week period preceding the event,

---

[18] (Citations and punctuation omitted.) Id. (applying pre-2014 juvenile code).

[19] See *In the Interest of H. B.*, 324 Ga. App. 36, 38-39 (1) (749 SE2d 38) (2013).

[20] See OCGA § 15-11-180 ("The petitioner shall have the burden of proving the allegations of a dependency petition by clear and convincing evidence.").

14

there is no evidence that the mother failed to provide adequate food, shelter, or education to A. W.[21]

The Department argues that harm can be inferred because of (1) the mother's "chronic"[22] methamphetamine abuse; and (2) "daily arguments" between the mother and father. The daily arguments, as explained above, apart from the single incidence of family violence between the mother and the father, does not rise to the level of abuse under the statute; the Department has failed to present evidence of the nature of the parental arguments, much less that they were daily or that they reached a level to constitute neglect.[23]

Regarding the mother's methamphetamine use, the evidence presented at the hearing showed that the mother had used methamphetamine for approximately six weeks, she never used the substance prior to that time frame, and she had ceased

---

[21] See *In the Interest of H. B.*, 324 Ga. App. at 37-39 (1), citing *In the Interest of S. M.*, 321 Ga. App. 827, 832 (743 SE2d 497) (2013); *In the Interest of H. S.*, 285 Ga. App. at 842-844, citing *In the Interest of C. L. Z.*, 283 Ga. App. 247, 249 (641 SE2d 243) (2007).

[22] "Chronic" is defined as "continuing or occurring again and again for a long time," "always present or encountered," or "being such habitually." See *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/chronic.

[23] See *In the Interest of S. M.*, 321 Ga. App. at 832-833.

using the substance after her arrest. This is not sufficient to show such long-term unrehabilitated drug use to assume that it would persist if A. W. was returned to the mother at the time of the hearing.[24] To the extent that the Department argues that the mother was trying to instigate contact with the father or that her current living situation at the maternal grandmother's home would result in abuse or neglect, there is a complete lack of record evidence beyond Larkin's speculative, conclusory testimony for this argument to support the dependency determination.[25]

> While this court is mindful of the fact that [Department] caseworkers are charged with the safety and security of the most vulnerable among us, and in this laudable yet unenviable position are required to make at times alacritous decisions, as this court has noted previously, the right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances. We do not find that such circumstances existed here.[26]

---

[24] Compare with *In the Interest of J. L.*, 269 Ga. App. 226, 229 n.6 (603 SE2d 742) (2004) (collecting cases comparing when parental drug use constitutes sufficient evidence of deprivation/dependency to establish parental unfitness).

[25] As noted previously, the Department presented no evidence of any abuse or neglect on the part of the grandmother or K. W. while caring for A. W.

[26] (Punctuation and footnote omitted.) *In the Interest of H. S.*, 285 Ga. App. at 843-844.

Accordingly, the juvenile court's order finding A. W. dependent is hereby reversed.

2. Based on our holding in Division 1, we do not address the mother's second enumeration of error except to note that there is no record evidence of K. W.'s or the grandmother's inability to care for A. W. had she been placed in either person's custody.

*Judgment reversed. Dillard, P. J. and Bethel, J., concur*.