**THIRD DIVISION
ELLINGTON, P. J.,
MERCIER and GOBEIL, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 23, 2018**

# In the Court of Appeals of Georgia

A18A0948. IN THE INTEREST OF T. S., et al., CHILDREN.          GO-034

GOBEIL, Judge.

The Lowndes County Juvenile Court entered an order finding L. S., born in 2007, and T. S., born in 2010 (collectively, "the children") dependent as to their mother, and the court awarded temporary custody of the children to the Lowndes County Department of Family and Children Services ("the Department").[1] The mother now appeals, arguing that the Department failed to establish by clear and convincing evidence that the children were dependent. For the reasons that follow, we affirm.

> [O]n appeal from a [dependency] order, we view the evidence in the
> light most favorable to the juvenile court's judgment to determine

---

[1] To the extent that the juvenile court made a dependency determination as to the children's father, who legitimated the children after entry of the juvenile court's order, his case is not before us at this time.

whether any rational trier of fact could have found clear and convincing evidence of [dependency]. In this review, we do not weigh the evidence or determine the credibility of witnesses; instead we defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met.

*In the Interest of G. R. B.*, 330 Ga. App. 693, 698 (769 SE2d 119) (2015) (footnotes and punctuation omitted). See also *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016).

The record shows that on September 12, 2016, the Department filed a complaint alleging that the mother's boyfriend[2] had shot the children with a BB gun in the mother's presence on April 18, 2016. The complaint further alleged that there was drug use and domestic violence in the household, and the mother had not provided for her children.[3] The Department subsequently filed a dependency petition on October 11, 2016, alleging that the Department could not ensure the children's safety and well-being in their mother's care. Specifically, the Department described

_____

[2] The mother's boyfriend is not the biological father of the children. It is also unclear whether he is the mother's fiancé or boyfriend. As of the date of the dependency petition hearing on November 1, 2016, the mother remains in a relationship with the boyfriend.

[3] The complaint described that the children had been "safety resourced" to a family friend on June 8, 2016.

2

that the mother had continued to allow her boyfriend, who had tested positive for methamphetamine on September 9, 2016, to have contact with the children in violation of her case plan. Further, the mother had failed to secure housing or employment and had been living in a temporary shelter.

At the dependency petition hearing, Department case manager Adrian Rivers described that the Department received a report on April 28, 2016, that the mother's boyfriend had shot the children with a BB gun or pellet gun in the mother's presence. The children also witnessed the boyfriend "roll up something green and smoke it." The children had reported the incident at school and described that they were afraid of the mother's boyfriend. Upon receipt of the report, Rivers met with the mother at her job and then traveled to her home. The mother's boyfriend, however, would not let him enter the home. Rivers observed physical marks on the children, but he never asked to see the BB gun or bullets. The mother's boyfriend denied shooting the children, and the mother explained that she was not present at the time of the alleged incident. The mother agreed to the terms of the Department's safety plan that required her to keep the children away from her boyfriend and to live with a family friend. Shortly thereafter, the Department learned that the mother frequently left the children with the family friend for days at a time without disclosing her whereabouts. On May

3

5, 2016, Rivers contacted the mother via telephone and advised her that she needed to be present with the children in the family friend's home and that the family friend could not serve as the children's primary caregiver. On June 2, 2016, the Department located the mother and her boyfriend residing in a motel with the children present. The mother apologized to Rivers for her failure to comply with the safety plan. The Department initiated a second safety plan, to which the mother agreed, which required the children to be placed with the family friend to address the concern of the children being in contact with the mother's boyfriend. The Department also determined that the mother needed ongoing services to help her secure stable housing and other required assessments.

Monica Inman, a case manager for the Department, testified that she took over the mother's case at the end of June 2016, at which time the mother's whereabouts were unknown. Approximately a month later, the Department located the mother living at a shelter with her boyfriend. A family team meeting was held at the shelter to discuss the Department's case plan, and services were ordered for the mother to receive assistance.[4] Inman described that the mother had been making good progress

---

[4] Inman recalled giving the mother a written copy of her case plan in the Department's office, and she discussed the contents of the plan with the mother "numerous times."

while residing in the shelter as she had obtained employment and was working on securing more permanent housing. Shortly thereafter, the mother moved out of the shelter after the boyfriend was "discharged" from the shelter, but she did not report her new address to the Department.[5] Inman located the mother approximately two weeks later, living in an abandoned mobile home with her boyfriend. About a month later, the mother disappeared again, and was later found living in a motel with her boyfriend. Throughout her involvement in the case, Inman reported that the mother had lived in approximately six or seven different addresses and never reported a change in residence to the Department, which in turn inhibited the Department's ability to provide the mother with necessary services. It appeared that the mother was more focused on her boyfriend than the children's welfare. Specifically, Inman testified that "each time [she] met with [the mother] her main conversation was [the boyfriend]. It was not her children. It was [the boyfriend]." Inman opined that "this

---

[5] A shelter employee testified that residents were not required to submit to regular drug screens to stay at the shelter. She explained, however, that the shelter retained the discretion to ask a resident to submit to a drug screen if warranted. If a resident refused to submit to a request for a drug screen, he would be required to leave the shelter. On July 20, 2016, the mother's boyfriend refused a drug test request from the shelter, and he left the shelter the next day. The boyfriend also had been written up for his failure to comply with other rules in the shelter.

could have been an easy case, but [the mother] just did not have the stability to maintain one place so that [the Department] could provide those services."

Inman also testified that the mother's boyfriend had been uncooperative with the Department. He continued to abuse drugs, failed to participate in substance abuse counseling, and failed to follow up with mental health services. During her interactions with the mother's boyfriend, Inman reported feeling threatened because he could get "explosive and hostile . . . when something doesn't go his way or he doesn't like something that's said." Inman noted that the boyfriend's "mood changes for whatever reason," and she has "felt threatened in his presence." Inman also testified that caring for the children had taken an emotional toll on the family friend because she was not receiving any financial support from the mother and had her own family to care for. In fact, the mother had failed to financially support or otherwise provide for the children since at least April 2016.

A therapist at Pathway to Hope, an addiction treatment center, testified that she completed a parental fitness assessment of the mother on June 13, 2016, which included an in-person interview and screening tests. During the interview, the mother (1) revealed that she had been the victim of sexual and physical abuse as a child; (2) admitted that she had smoked marijuana in her youth, but denied using any illegal

6

substances in the past three years; (3) reported a history of domestic violence with the children's father, which had resulted in her seeking refuge in a battered woman's shelter; and (4) disclosed symptoms consistent with depression, a condition for which she had never received treatment. The mother described being in a relationship with her current boyfriend for approximately a year at the time of the assessment.

The screening tests revealed that the mother had elevated scores with respect to potential for physical child abuse. The mother also scored highly with respect to distress and problems with children and self, which the therapist opined was related to the mother's homelessness, separation from her children, untreated mental health issues, past experience with domestic violence, and concerns about her children's behavior. The therapist explained that it was critical that the mother receive necessary services in order to protect the children from potential abuse or neglect, with those services to include: (1) a diagnostic evaluation of her mental health needs, (2) individual therapy for both the mother and children, as well as family therapy, (3) community support services to help the mother manage stress, and (4) access to resources for housing, budgeting, and parenting classes.

A second therapist at Pathway to Hope testified that she had performed urine and hair follicle screens on both the mother and her boyfriend on September 9, 2016.

The mother had tested negative on both screens. The boyfriend's urine tested negative, but the hair follicle screen tested positive for amphetamines, methamphetamines, and cocaine.

The mother testified that she and the children were living with her boyfriend at the time of the Department's initial intervention in April 2016.[6] She described that the children loved her boyfriend, but they told people that they feared him because he would raise his voice when reprimanding them. She denied that the boyfriend had ever physically disciplined the children, and further denied any instances of domestic violence between the couple.

With respect to the specific allegations in the dependency petition, the mother testified that she had purchased the toy pellet guns with plastic bullets at the Dollar Store. She clarified that the guns were not high powered and the boyfriend had played with the toy guns with the children several times in the past. With regard to the specific incident, she testified that she "[a]llegedly . . . was at work because [she] [did

---

[6] At that time, the mother, the boyfriend, the children, and the boyfriend's sister were living in a six-bedroom house owned by the boyfriend's mother. According to the mother, as a condition of living in the house rent-free, the mother and the boyfriend were responsible for paying their share of the utility bills. The mother explained that part of the reason they had to leave this home was because her boyfriend's mother was concerned about her "image" after the Department started an investigation into the family.

not] remember this ever happening." She acknowledged, however, that she saw triangle-shaped marks on one of the children's skin. But, she noted that, she had been shot by BB's in the past and they inflicted circle-shaped marks upon contact on skin.

The mother acknowledged that she had agreed to the terms of the Department's safety plan, which required her to keep the children away from her boyfriend, after the children had reported to the school that the boyfriend had shot them with a BB gun. She also admitted that she violated the safety plan when she brought the children to stay at a motel room where her boyfriend was living at the time. The mother also confirmed that she was supposed to provide the family friend, who had been serving as a safety resource, a portion of her food stamps to help support the children. The mother claimed that when she asked her friend if she needed assistance in providing clothing and school supplies for the children, the friend responded "it was taken care of." Moreover, the mother claimed that her food stamps had been "cut off" right before she planned to give them to the family friend. The mother stated that she never received a copy of the case plan in writing. Nevertheless, she was aware of the terms of the second case plan that required her to undergo a psychological assessment, obtain stable housing, and participate in individual therapy. Although the mother has

9

been undergoing therapy on weeks when she did not have to work, she admitted that she had not completed a psychological assessment.

The mother was employed as of the date of the hearing and living in a motel. She admitted that she had left a shelter after her boyfriend refused to submit to a drug screen. She explained that she and her boyfriend had planned a trip to Atlanta on the day of the drug screen for his cancer treatment and that the shelter refused the boyfriend's request to reschedule the test. After leaving the shelter, the couple lived in an abandoned mobile home, but later moved to a motel because the mobile home was infected with bed bugs. The mother described that she remained in a relationship with the boyfriend, but noted that she was willing to leave him in order to regain custody of her children. She maintained that she had never tested positive for drugs during the Department's investigation, and she had only recently learned of her boyfriend's positive drug screen. The mother was aware that her boyfriend took medication for schizophrenia.

Following the hearing, the juvenile court entered an order on November 8, 2016, nunc pro tunc to November 1, 2016, finding that the children were abused or neglected based on the mother's repeated failure to keep the children away from her boyfriend, as well as her failure to find suitable and stable housing or address her

mental health needs. The trial court found that the mother had failed to ensure a safe environment for the children, and the Department had made reasonable efforts to eliminate the need to remove the children from the home or extended family. The children were adjudicated dependent with temporary custody awarded to the Department. The juvenile court instructed the Department to set up supervised visitation between the mother and children, and develop a case plan for reunification. The mother now appeals.

In her sole contention of error, the mother argues that the juvenile court erred by finding the children dependent because there was no clear and convincing evidence of abuse or neglect. "Under the most recent version of Georgia's Juvenile Code, the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a dependent child." *In the Interest of S. C. S.*, 336 Ga. App. at 244 (footnote and punctuation omitted). The criteria to be reviewed by the juvenile court are clear. Pursuant to OCGA § 15-11-2 (22),[7] a dependent child is defined as "a child who: (A) Has been abused or neglected and is in need of the protection of the court[;] (B) Has

---

[7] Because the dependency petition was filed in 2016, the new Juvenile Code applies. See *In the Interest of S. C. S.*, 336 Ga. App. at 244 n. 4, quoting Ga. L. 2013, p. 294, § 5-1.

11

been placed for care or adoption in violation of law; or (C) Is without his or her parent, guardian, or legal custodian." But even after finding a child to be dependent, a juvenile court can only remove a child from a parent's custody if it finds that "the [dependency] resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." *In the Interest of J. H.*, 310 Ga. App. 401, 402 (713 SE2d 472) (2011). And "[p]roof of unfitness must be shown by clear and convincing evidence; this standard recognizes the importance of the familial bond and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior." *In the Interest of C. L. Z.*, 283 Ga. App. 247, 249 (641 SE2d 243) (2007) (footnote and punctuation omitted).

Here, the juvenile court found the children dependent pursuant to subparagraph (A), "a child who . . . [h]as been abused or neglected and is in need of the protection of the court [.]" OCGA § 15-11-2 (22) (A). First, abuse is defined as

> (A) Any nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; (B) Emotional abuse; (C) Sexual abuse or sexual exploitation; (D)

12

Prenatal abuse; or (E) The commission of an act of family violence as defined in Code Section 19-13-1[8] in the presence of a child. An act includes a single act, multiple acts, or a continuing course of conduct. As used in this subparagraph, the term "presence" means physically present or able to see or hear.

OCGA § 15-11-2 (2).

In this case, adopting the trial court's factual findings, the record demonstrates only a single incident of violence,[9] in which the children reported to their school that the mother's boyfriend had shot them with a BB gun. Other than evidence that the children were understandably upset that morning at school and told the school that they were scared of the boyfriend, there is no clear indication that the children suffered any emotional or physical harm from the incident.

---

[8] See OCGA § 19-13-1 ("As used in this article, the term 'family violence' means the occurrence of one or more of the following acts between past or present spouses, persons who are parents of the same child, parents and children, stepparents and stepchildren, foster parents and foster children, or other persons living or formerly living in the same household: (1) Any felony; or (2) Commission of offenses of battery, simple battery, simple assault, assault, stalking, criminal damage to property, unlawful restraint, or criminal trespass . . . .").

[9] The Department alleged the existence of domestic violence between the mother and her boyfriend in its initial complaint, but there was no evidence presented during the hearing to establish any instances of physical abuse between the couple.

However, the Department case manager described feeling threatened in her interactions with the father because he could get "explosive and hostile." Moreover, the mother testified that the children told people that they feared the boyfriend because he would raise his voice when reprimanding them. The mother also admitted that although she was aware that her children were afraid of her boyfriend, she did not "look into any of it because of [her] interactions with him there with [her] children around." As noted by the Department case manager, the mother did not appear to recognize the issues with her boyfriend and seemed more focused on maintaining a relationship with the boyfriend than the children's welfare. Notably, the mother knowingly violated the terms of the Department's safety plan on multiple occasions, including after the children had been "safety resourced" to a family friend in June 2016, by failing to keep the children away from the boyfriend. See *In the Interest of C. H.*, 305 Ga. App. 549, 557 (700 SE2d 203) (2010) ("Where evidence shows that a parent violates a safety plan by placing a child in an abusive environment, a court may find [dependency] and order loss of custody."). Although a close call, based on the foregoing, we cannot say that the evidence was insufficient to support the juvenile's court finding of dependency based on abuse. See *In the Interest of L. F.*,

14

275 Ga. App. 247, 250 (620 SE2d 476) (2005) ("It is the province of the juvenile court to weigh the evidence and determine its credibility.").[10]

Next, we conclude that the Department put forth sufficient evidence to sustain the juvenile court's finding that the children were neglected or that they would be neglected if they were allowed to stay with the mother. In pertinent part, the Code defines "[n]eglect" as "(A) [t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; [or] (B) [t]he failure to provide a child with adequate supervision necessary for such child's well-being . . .." OCGA § 15-11-2 (48). This definition is similar to former OCGA § 15-11-2 (8) (A) (2013), which defined "a deprived child [as] a child who is without proper parental

---

[10] Compare *In the Interest of H. S.*, 285 Ga. App. 839, 842-843 (648 SE2d 143) (2007) (reversing deprivation finding where child witnessed one incident of domestic violence between mother and father during which the father grabbed child's arm and father had hit child on the head on "a couple" of other occasions when she ran through the house, but no evidence these incidents had a negative impact on child); *In the Interest of T. L.*, 269 Ga. App. 842, 843-846 (2) (605 SE2d 432) (2004) (reversing finding of deprivation in absence of evidence showing how child was negatively impacted by "filthy" and cluttered conditions in home); *In the Interest of M. L. C.*, 249 Ga. App. 435, 436-439 (2) (548 SE2d 137) (2001) (reversing finding of deprivation where parents admitted to substance abuse, depression, and incidents of domestic violence but no evidence presented showing adverse impact on child and neighbors testified that they were "wonderful" parents).

15

care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals.'" *In the Interest of S. M.*, 321 Ga. App. 827, 831 (743 SE2d 497) (2013) (punctuation omitted). In order to make this determination, the court focuses on the needs of the child rather than parental fault. Id.

In this case, testimony at the hearing clearly established that the mother has not adequately cared for or supported her children. Due to the mother's frequent moves, she has consistently failed to partake in services offered by the Department, including assistance in securing stable housing. See *In the Interest of T. V.*, 302 Ga. App. 124, 127 (1) (690 SE2d 457) (2010) ("Lack of stable housing and lack of support due to a parent's unstable or irregular employment are appropriate factors in determining deprivation.") (citation omitted). In fact, the mother opted to leave the temporary shelter, even though the shelter staff were working to help the mother secure permanent housing,[11] in a bid to stay with her boyfriend after he was discharged from the facility for refusing to submit to a drug test. Moreover, the mother has repeatedly moved around without informing the Department of her whereabouts. By her own admission, the mother has failed to abide by the terms of the Department's safety

---

[11] The shelter assisted the mother in paying past-due utility bills.

plan, which required her to keep the children away from her boyfriend. At the time of the hearing, the mother testified that she was employed, but there is no indication that she has furnished any financial support to her children or that her current income would be adequate to provide for the children. *In the Interest of L. F.*, 275 Ga. App. at 251 (In determining whether the parent's current situation is stable, the juvenile court may consider the parent's past conduct and decide, "[w]hat weight, if any, is to be given to recent improvements in [the parent's] housing [and employment] circumstance . . . .").

The juvenile court also pointed to the mother's untreated mental health issues in its order of dependency. During an interview with a therapist, the mother disclosed symptoms consistent with depression, a condition for which she had never received treatment. The mother also posted high scores in screening tests for depression and potential for child abuse. The therapist explained that it was critical that the mother receive necessary services in order to protect the children from potential abuse or neglect. The mother admitted that she was aware of the terms of the safety plan, which required her to undergo a psychological assessment, obtain stable housing, and participate in individual therapy. Although the mother has been undergoing therapy on weeks when she did not have to work, she had not completed a psychological

assessment. Moreover, the mother's ability to partake in necessary services was significantly impacted by her frequent moves and her failure to update the Department on her whereabouts. We note that the mother has voiced a willingness to leave the boyfriend in order to regain custody of the children. Nevertheless, the record evidence shows that the mother has continued to violate the terms of the safety plan that required her to keep the children away from her boyfriend. Despite the lack of evidence in the record to show the incidence of any physical, emotional or mental abuse of the children on the part of the mother, "[o]ur law does not require a child to suffer serious injury" before State intervention. *In the Interest of G. B.*, 263 Ga. App. 577, 583 (588 SE2d 779) (2003) (addressing termination of parental rights).

Construed in the light most favorable to the juvenile court's finding, therefore, we conclude that sufficient evidence supports the juvenile court's finding of abuse or neglect due in part to the mother's failure to properly care for and support the children. Accordingly, we affirm the juvenile court's order finding the children dependent as to the mother.

*Judgment affirmed. Ellington, P. J., and Mercier, J., concur.*